# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| **THE PREGNANCY CARE CENTER OF ROCKFORD; THE DIOCESE OF SPRINGFIELD IN ILLINOIS**, | Case No.: 1:25-cv-02983 |
| Plaintiffs, | |
| v. | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **JAMES BENNETT**, in his official capacity as Director of the Illinois Department of Human Rights; **KWAME RAOUL**, in his official capacity as Illinois Attorney General, | |
| Defendants. | |

## INTRODUCTION

1. This case challenges an Illinois law that forbids religious employers from speaking and acting consistent with their mission-critical religious beliefs about reproductive issues like abortion, sterilization, and contraception.

2. For millennia, the Christian tradition has marveled in reflection upon a profound mystery: the Creator of the universe endowed men and women with the power to *participate* in His work of creation. Imitating the Trinity as a union of persons joined by love, God empowers the marital union to reproduce human life. *See* Catechism of the Catholic Church ("CCC") § 372 (citing Gen. 1:28 & 2:24).

3. Proclaiming that God became man as an unborn child in the context of a human family, Christians affirm the inestimable dignity of the human person, unborn children, marriage, and family.

4. Like most religious traditions, the Christian tradition recognizes moral responsibilities in matters of reproduction. For example, for nearly 2,000 years the Catholic Church has taught that anti-reproductive decisions like abortion, sterilization, and contraception violate the sanctity of human life and the nature of the sexual act. While vigorously encouraging reproductive assistance by licit means, the Church opposes actions that discard human life or undermine marital union.

5. Plaintiff The Pregnancy Care Center of Rockford ("PCC of Rockford") affirms, proclaims, and strives to live out Christian beliefs about the dignity of human life and the nature of marriage by sharing the Gospel, promoting Christian beliefs on reproduction, opposing abortion, and providing free resources.

6. Plaintiff The Diocese of Springfield in Illinois ("Diocese of Springfield") affirms, proclaims, and strives to live out the teachings of the Catholic Church, including indispensable teachings about reproduction and marriage.

7. Plaintiffs employ individuals who represent their organizations and advance their religious missions through word and deed.

8. Plaintiffs have open positions that they seek to fill immediately with individuals who affirm and abide by their beliefs about reproduction and marriage.

9. But the Illinois Human Rights Act ("Act"), as recently amended by H.B. 4867 ("New Bill"), dictates how religious employers must speak and act about employees' voluntary reproductive decisions like abortion, contraception, and sterilization. *See* 775 ILL. COMP. STAT. ANN. § 5/1-102(A); H.B. 4867, 103rd General Assemb. (2024).

10.    The Act prohibits employers from disciplining or refusing to hire employees based on reproductive decisions. *Id.* § 5/2-102(A) ("Employment Clause"). But Plaintiffs' policies require them to discipline and refuse to hire employees who make reproductive decisions that violate their religious beliefs.

11.    The Act prohibits employers from engaging in speech and conduct that some may deem "unwelcome" and "offensive." *Id.* §§ 5/2-102(A) & 5/2-101(E-1) ("Offensive Speech Clause"). But Plaintiffs frequently express their religious beliefs on reproduction in a manner that violates the Act.

12.    The Act requires employers to grant employee accommodations related to reproductive decisions. *Id.* § 5/2-102(J) ("Accommodation Clause"). But Plaintiffs' policies prohibit them from accommodating reproductive decisions that violate their religious beliefs.

13.    The Act prohibits employers from providing unequal employee benefits based on reproductive decisions. *Id.* § 5/102(A) ("Benefit Clause"). Plaintiffs offer benefits for employees who make reproductive decisions they condone while denying benefits for employees who make reproductive decisions that violate their beliefs.

14.    The Act requires employers to broadcast all of these requirements in employee handbooks and workplace posters. *Id.* § 5/2-102(K)(1) ("Notice Clause"). But Plaintiffs do not—and will not—lie to their employees by saying that employees can make sinful reproductive decisions without facing adverse action and with the blessing of ministry benefits and accommodations.

15. Thus, the Act renders Plaintiffs powerless to control deeply theological internal matters and to separate themselves from conduct that fatally undermines their mission and message.

16. By dictating Plaintiffs' response to voluntary reproductive decisions, the Act goes far beyond protecting immutable characteristics and enters a "religious thicket" of profound theological significance. *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 981 (7th Cir. 2021) (quoting *Serbian E. Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 619 (1976)).

17. Indeed, Lieutenant Governor Juliana Stratton publicly admitted that by enacting the New Bill, "Illinois is not just protecting a right; it is championing fundamental principles" about reproduction contrary to Plaintiffs' Christian beliefs. Office of Gov. J.B. Pritzker, *New Law Expands Reproductive Rights*, https://perma.cc/6TCW-SDWS.

18. The Act violates Plaintiffs' rights to expressive association, free exercise of religion, religious autonomy, free speech, and equal protection. Plaintiffs are entitled to declaratory and injunctive relief to stop these violations.

## JURISDICTION AND VENUE

19. This action arises under 42 U.S.C. § 1983 et seq. ("Civil Rights Act") and the First and Fourteenth Amendments to the United States Constitution.

20. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

21. This Court has the authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

4

22.     This Court has the authority to grant the requested injunctive relief under 28 U.S.C. § 1343(a)(3), and Federal Rule of Civil Procedure 65.

23.     This Court has the authority to award the requested costs and attorneys' fees under 42 U.S.C. § 1988(b).

24.     Venue lies in this district under 28 U.S.C. § 1391(b) because Defendants operate and reside in the Northern District of Illinois, a Plaintiff operates and resides in this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

25.     Because the U.S. District Court for the Northern District of Illinois has no divisional venue requirement, Plaintiffs can file this case in either the Western Division or the Eastern Division. *Graham v. United Parcel Serv.*, 519 F. Supp. 2d 801, 809 (N.D. Ill. 2007). The Western Division is an appropriate divisional venue because a Plaintiff operates and resides in this Division, and the Attorney General maintains an office in this Division.

## **PARTIES**

26.     Plaintiff PCC of Rockford is a religious nonprofit corporation duly incorporated under the laws of the State of Illinois, with its principal place of business at 4108 Morsay Drive, Rockford, IL 61107.

27.     Plaintiff Diocese of Springfield is a religious nonprofit corporation duly incorporated under the laws of the State of Illinois, with its principal place of business at 1615 W. Washington St, Springfield, IL 62702.

28.     Defendant James Bennett is the Director of the Illinois Department of Human Rights ("Department"). He is sued in his official capacity only.

29.     The Department is charged with enforcing the Illinois Human Rights Act. *See* 775 ILL. COMP. STAT. ANN. § 5/7-101. The Department can directly initiate charges of discrimination. *Id.* § 5/7A-102(A)(1); 56 ILL. ADMIN. CODE 2520.10. The Department can also solicit, receive, investigate, and adjudicate charges of discrimination under the Act, including with the use of compulsory process. 775 ILL. COMP. STAT. ANN. §§ 5/7A-102(C)–(D), 5/7-101(B)–(C). The Department can file discrimination complaints with the Illinois Human Rights Commission ("Commission") and intervene in complaints pending before the Commission. *Id.* §§ 5/2-101(D), 5/7A-102(D)(4). The Department can seek judicial enforcement of the Act by seeking temporary and permanent relief to enforce orders of the Commission. *Id.* §§ 5/7-101(E) & 5/7A-104.

30.     The Department has an office in the Northern District of Illinois at 555 West Monroe Street, Ste. 700, Chicago, IL 60661.

31.     On information and belief, Defendant Bennett resides in the Northern District of Illinois.

32.     Defendant Kwame Raoul is the Illinois Attorney General. He is sued in his official capacity only.

33.     The Attorney General can also enforce the Act. 775 ILL. COMP. STAT. ANN. § 5/10-104. The Attorney General can directly investigate patterns and

practices of discrimination, including with the use of compulsory process. *Id.* The Attorney General can also file civil lawsuits to enforce the Act. *Id.* § 5/10-104(A)(1).

34. The Attorney General has multiple offices in the Northern District of Illinois, including an office in the Western Division at 200 S. Wyman St., Ste. 307, Rockford, IL 61101.

35. On information and belief, Defendant Raoul resides in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### I. Plaintiffs' religious beliefs and open employment positions.

#### A. PCC of Rockford

36. Founded in 1982, PCC of Rockford has served the Rockford community for more than 40 years by providing help and hope to women and families facing unplanned pregnancies.

37. PCC of Rockford is an Illinois nonprofit corporation organized and operated exclusively for charitable, religious, educational, and scientific purposes. *See* PCC of Rockford Amended Articles of Incorporation, **attached as Exhibit 1**.

38. Animated by its religious beliefs, PCC of Rockford provides pro-life services and resources free of charge. PCC of Rockford offers lab-quality pregnancy testing, ultrasounds, and tests for sexually transmitted infections (STI). It also provides families with material resources, including diapers, clothing, blankets, cribs, car seats, and other essential items to care for children.

39. But the heart of PCC of Rockford's ministry involves communicating the Gospel, educating, counseling, and guiding women and families.

40. In person, on the telephone, on its website, on its online blog, and through social media accounts, PCC of Rockford engages in speech and expression to educate women and families about their options and resources when facing an unplanned pregnancy.

41. PCC of Rockford counsels pregnant women and their families about their options to parent, choose adoption, or end a child's life through abortion.

42. PCC of Rockford also offers mentoring programs, which provide women and families with help to develop the skills, education, relationships, and confidence needed to parent their children.

43. PCC of Rockford's Articles of Incorporation specify its religious mission and purposes:

> In the name of Jesus Christ, to restore hope, offer emotional and spiritual healing, and empower people to make informed pregnancy related choices that value the sanctity of human life. To share by word and deed the Gospel of Jesus Christ with all who seek our services. To offer pregnancy tests, ultrasound exams, care, education and material assistance. To offer sexual risk avoidance programs, including abstinence-based presentations to school and youth groups. To render all services free of charge.

*Id.*

44. PCC of Rockford's bylaws articulate its statement of religious beliefs on the sanctity of human life:

> We believe that all human life is sacred and created by God in His image (Genesis 1:27). Human life is of inestimable worth in all its dimensions, including pre-born babies, the aged, the physically or mentally

8

challenged, and every other state or condition from conception to natural death. We are therefore called to defend, protect, and value all human life (Psalm 139). We believe and affirm that life begins at conception, at which time the full genetic blueprint for life is in place. Accordingly, we believe that our expression of love and service to God requires that we work to protect and honor life in all stages of creation. As well, we believe and affirm that God's calling upon us commands that we make special efforts to protect the most vulnerable among us. As such, we view life from conception through birth to be uniquely vulnerable, and therefore work to protect and defend life in these early stages. We do not recommend, provide, or refer for abortion or abortifacient contraceptive medications.

PCC of Rockford Bylaws, **attached as Exhibit 2** at 3.

45.     PCC of Rockford maintains an Employee Handbook, which confirms that it is a "ministry with the mission to offer compassionate help and hope to those experiencing an unplanned pregnancy, to present sexual abstinence as a positive lifestyle for singles, to provide opportunity for healing and restoration to those who have been hurt by abortion, and to present an opportunity for all to enter into a life-changing relationship with Jesus Christ." PCC of Rockford Employee Handbook, **attached as Exhibit 3** at 3.

46.     According to its mission statement, "The Pregnancy Care Center of Rockford offers help and hope in the name of Jesus Christ to those facing pregnancy decisions. It is our vision to see God glorified through loving, empowering, and supporting all those facing unplanned pregnancy decisions, so that choosing abundant life today and for future generations is celebrated." *Id.* at 3.

47.     PCC of Rockford adopted the ancient Apostles' Creed as its Christian Statement of Faith. *Id.*; *see also* PCC of Rockford Bylaws, Ex. 2 at 2.

48.     PCC of Rockford adopted a Statement of Principle, which articulates the organization's fundamental principles, including:

- "The Pregnancy Care Center of Rockford is an outreach ministry of Jesus Christ through His Church. Therefore, The Pregnancy Care Center, embodied in its staff and volunteers, is committed to presenting the Gospel to women with crisis pregnancies — both in word and in deed. Therefore, those who serve as The Pregnancy Care Center directors, staff, volunteers, and Board members are expected to walk in a personal relationship with Jesus Christ and seek to live a lifestyle that reflects Him."

- "The Pregnancy Care Center is committed to assisting women carry to term by providing emotional support and practical assistance."

- "The Pregnancy Care Center does not refer for or perform abortions."

- "The Pregnancy Care Center does not recommend, provide, or refer single women for contraceptives."

PCC of Rockford Employee Handbook, Ex. 3 at 3–4.

49.     PCC of Rockford's Employee Handbook provides that "[a] personal relationship with Jesus Christ is a requirement for any employee, as well as believing that abortion is never a morally acceptable option." *Id.* at 6.

50.     PCC of Rockford's Employee Handbook emphasizes that its expectations for pro-life beliefs, advocacy, and conduct are "implemented on all

levels of operations including client counsel, school presentations, and the expected lifestyle of all volunteers and staff." *Id.* at 6.

51.     PCC of Rockford also adopted a Policy for Employee and Volunteer Moral Conduct ("Conduct Policy"), which covers both professional and personal conduct: "The PCC seeks to be an organization that is 'Christian' in every sense of the word; therefore, all staff, volunteers, and Board Members represent The PCC — and more importantly, the Gospel of Jesus Christ—in their work as well as in their private lives." *Id.* PCC of Rockford Conduct Policy, **attached as Exhibit 4**, at 1.

52.     PCC of Rockford's Conduct Policy also covers both words and deeds: "Words clarify the meaning of our deeds, deeds verify the integrity of our words about Jesus Christ, and signs are the acts of God in the midst of what we do and say." *Id.* "Throughout all of life, in word and deed, The PCC's staff must be committed to glorifying God and witnessing His love in the person of His Son Jesus Christ." *Id.* "We desire to model behavior that is consistent with our Christian commitment and witness, calling others to a life-changing commitment in the name of Christ." *Id.* Representatives of the PCC of Rockford "are Christian 24/7, not just while we are at the PCC." *Id.* at 3. "As a Christian organization, The PCC expects biblically-faithful conduct both inside and outside the workplace" because "[s]uch conduct reinforces the center's core mission, instead of distracting from it." *Id.*

### *Open Positions at PCC of Rockford*

53.     PCC of Rockford regularly maintains about 14 employees.

54.     On average, the PCC of Rockford hires 2-4 employees each year.

11

55.     It is common for PCC of Rockford to receive multiple applications for a single open position.

56.     Some applicants for open positions are not aligned with PCC of Rockford's mission but apply out of a need for employment. PCC of Rockford does not hire such individuals, but their applications show that PCC of Rockford does not only receive applications from those already aligned with its mission.

57.     The PCC of Rockford currently seeks to fill two employee positions: (1) Staff Nurse; and (2) Receptionist.

58.     According to its position description, the Staff Nurse will provide "nursing care, client education, perform limited OB ultrasounds, and related administrative duties." PCC of Rockford Staff Nurse Position Description, **attached as Exhibit 5** at 1.

59.     To advance PCC of Rockford's mission, the Staff Nurse must be "a committed Christ-follower who demonstrates a personal relationship with Christ," one who "[e]xhibits a strong pro-life commitment and upholds a lifestyle of sexual purity," and one who is "[w]illing to uphold the Statement of Principle, Statement of Faith, and policies of The Pregnancy Care Center of Rockford." *Id.*

60.     The Staff Nurse engages in both internal and external expressive activity to promote a pro-life message. The Staff Nurse directly communicates with clients to "[p]rovide education on client options and risks involved," and serves as the first person to announce the joy of new life to clients in intimate moments while performing ultrasounds and pregnancy tests. *Id.*

61.     The Staff Nurse also engages in internal communications to advance the organization's mission, including meeting with the Director of Nursing to "communicate any medical or client related issues," and participating in nurse meetings, staff meetings, and an annual ministry retreat. *Id.* at 1–2.

62.     The Staff Nurse represents PCC of Rockford when communicating with the community in "public relations" roles, including participating in all fundraising events and giving facility tours for donors and community members. *Id.* at 2.

63.     PCC of Rockford also seeks to immediately hire a Receptionist. According to its position description, the Receptionist serves as the first point of contact for the PCC of Rockford, greeting clients and other visitors, answering phones, scheduling client appointments, and receiving material donations. PCC of Rockford Receptionist Position Description, **attached as Exhibit 6** at 1–2.

64.     To advance PCC of Rockford's mission, the Receptionist must be a "[c]ommitted Christ-follower who demonstrates a personal relationship with Christ," who "[e]xhibits a strong pro-life commitment and upholds a lifestyle of sexual purity," and "[u]phold the Statement of Principle, Statement of Faith, and policies of The Pregnancy Care Center of Rockford." *Id.*

65.      The Receptionist engages in both internal and external expressive activity to promote a pro-life message. The Receptionist "[m]ust be comfortable speaking with women facing pregnancy decisions and providing empathetic support," makes "quality first impressions of the center for clients walking through

13

the door," engages with external stakeholders to receive donations or give facility tours, and participates in internal meetings and retreats. *Id.*

66. PCC of Rockford believes that individuals in *any* of its employment positions—including current and future open positions—would fatally undermine its pro-life mission and message by participating in a decision to obtain an abortion.

67. PCC of Rockford believes that it cannot credibly and effectively counsel families to forego objectionable reproductive decisions through employees who made those same unrepentant decisions themselves.

68. Regardless of whether a particular employee directly counsels families, PCC of Rockford believes that maintaining employees who make objectionable (and unrepentant) reproductive decisions undermines its public and internal message that it is sincerely committed to its mission.

69. PCC of Rockford also believes that its employees would find it more difficult to speak freely and persuasively on sensitive topics like reproduction with coworkers who made those objectionable decisions.

**B.  The Diocese of Springfield**

70. Plaintiff the Diocese of Springfield was established in 1923.

71. The Diocese of Springfield is an Illinois nonprofit corporation organized for religious purposes.

72. The Diocese of Springfield serves around 120,000 Catholics in western Illinois through 129 parishes.

73. The Diocese of Springfield's mission is "to build a fervent community of intentional and dedicated missionary disciples of the Risen Lord and steadfast

14

stewards of God's creation who seek to become saints. Accordingly, the community of Catholic faithful in the Diocese is committed to the discipleship and stewardship way of life as commanded by Christ Our Savior and as revealed by Sacred Scripture and Tradition." Diocese of Springfield Standards of Conduct, Book II, Part I § 503, **attached as Exhibit 7** at 1.

74. The Diocese of Springfield proclaims, teaches, and encourages individuals to live out all the teachings of the Catholic Church, including the Church's indispensable beliefs supporting the sanctity of life and the Christian view of marriage while opposing abortion, contraception, sterilization, and certain reproductive technologies that discard and destroy human life or that undermine the marital union, including IVF, ZIFT, ICSI, ovum donation, and surrogacy.

75. The Diocese of Springfield engages in speech and expressive activity in various contexts to promote and live out the Church's beliefs about reproduction and marriage.

76. Through its employees, the Diocese of Springfield makes statements affirming the Church's beliefs about reproduction and marriage in many contexts, including in homilies during Mass, encouragement during confession, spiritual counseling, marriage counseling, religious conferences and programs, internal leadership discussions, internal staff meetings, and in its print and social media.

77. To live out and promote such beliefs, the Diocese of Springfield has ministries that support and promote the dignity of human life.

15

78.    For example, the Diocese of Springfield has an Office of Marriage and Family Life that offers marriage preparation and family support services.

79.    The Diocese of Springfield also has an Office for Pro-Life Activities and Special Ministries, with a mission to "carry out the ministry of Jesus Christ and the gospel values of dignity for all life from conception to natural death." Diocese of Springfield, *Office for Pro-Life Activities*, https://dio.org/plasm/. "Through prayer, education, outreach and advocacy we provide the resources necessary to bring social change in light of catholic social teaching." *Id.*

80.    The Diocese of Springfield organizes and hosts an annual Mass for Life, which celebrates the sanctity of life and opposes anti-reproductive decisions like abortion, sterilization, and contraception.

81.    The Diocese of Springfield helps organize the annual Illinois Pro-Life March. The march includes a rally with pro-life speakers, a march to support pro-life beliefs and oppose objectionable reproductive decisions, and lobbying lawmakers to support pro-life legislation. The march and related events are expressive, and the Diocese of Springfield notes that its participants are "being a joyful witness to life and raising [their] voice for the voiceless at the Illinois Pro-Life March." Diocese of Springfield, *Illinois Pro-Life March*, https://dio.org/event/illinois-pro-life-march/.

82.    The Diocese of Springfield's Standards of Conduct explains that "[a]s employees of the Diocese of Springfield in Illinois, our employees are reminded that to the faithful and to the outside world, they represent the Catholic Church." Diocese of Springfield Standards of Conduct, Ex. 7 at 1.

83.    The Diocese of Springfield's Standards of Conduct states:

Every employee of the Diocese and Diocesan agencies shall act in an honest and forthright manner in all workplace concerns; treat co-workers, supervisors, volunteers, parishioners, students, and visitors with respect; and *conduct themselves in a moral and ethical manner consistent with Catholic principles*. Every employee, as a representative of the Catholic Church to the faithful and to the outside world, has a ministerial calling. Every position has a ministerial aspect. *Personnel must, therefore, conduct themselves in a way that does not contradict the doctrine and moral teaching of the Catholic Church.*

*Id.* (emphasis added).[1]

84.    The Diocese of Springfield believes that it would undermine its very mission to hire and retain employees who violate its religious beliefs and policies by making unrepentant reproductive decisions that violate its faith, including abortion, contraception, sterilization, or certain reproductive technologies that discard and destroy human life or that undermine the marital union, including IVF, ZIFT, ICSI, ovum donation, and surrogacy.

85.    The Diocese of Springfield believes that it cannot credibly and effectively counsel families to forego objectionable reproductive decisions through employees who made those same unrepentant decisions themselves.

86.    Regardless of whether a particular employee directly counsels families, the Diocese of Springfield believes that maintaining employees who make objectionable (and unrepentant) reproductive decisions undermines its message that it is sincerely committed to its mission.

---

[1] While the Diocese of Springfield believes that all of its employees have a ministerial role, the Diocese understands that not all of its positions may meet the current legal standard to satisfy the Religion Clauses' ministerial exception.

87. The Diocese of Springfield also believes that its employees would find it more difficult to speak freely and persuasively on sensitive topics like reproduction with coworkers who made those objectionable decisions.

*Open Positions at the Diocese of Springfield*

88. The Diocese of Springfield regularly maintains about 125 employees.

89. On average, the Diocese of Springfield hires about 15 employees each year.

90. It is common for the Diocese of Springfield to receive multiple applications for a single open position.

91. Some applicants for open positions are not aligned with the Diocese of Springfield's mission but apply out of a need for employment. The Diocese of Springfield does not hire such individuals, but their applications show that the Diocese does not only receive applications from those already aligned with its mission.

92. The Diocese of Springfield seeks to immediately hire two employee positions: (1) Respect Life Advocate; and (2) Associate General Counsel.

93. According to its position description and job posting, the Respect Life Advocate "plays a crucial role in fostering awareness and education among stakeholders within the Diocese of Springfield in Illinois," mainly focusing on issues of the sanctity of human life, reproductive issues in alignment with Church teaching, outreach on behalf of the Pontifical Mission Society, as well as promoting

18

Case: 3:25-cv-50127 Document #: 1 Filed: 03/20/25 Page 19 of 60 PageID #:19

principles of Catholic Social Teaching. Diocese of Springfield, Respect Life Advocate Position Description, **attached as Exhibit 8** at 1.

94. The Respect Life Advocate "collaborates on the planning and execution of impactful events and strategizes educational initiatives that highlight the value of human dignity. By engaging the community and facilitating discussions, this position seeks to create a culture that respects and uplifts every individual, promoting a deeper understanding of these vital matters." *Id.*

95. The Respect Life Advocate must be a "[p]racticing Catholic in full communion with the teachings of the Church." *Id.* at 2.

96. The Respect Life Advocate engages in expressive activity to promote the Diocese of Springfield's mission and message on reproduction. Among other things, the Advocate "[p]rovides educational information, materials, and training to parishes, clergy, deacons, and school staff on issues of life, charity, and justice." *Id.* at 1. The Respect Life Advocate also "develops effective communication methods to inform parish and school staff of services, resources, and advocacy opportunities available." *Id.*

97. The Respect Life Advocate serves as the primary contact for the Diocese of Springfield's pro-life ministries and programs with "internal and external" audiences. *Id.*

98. The Respect Life Advocate also works closely with the Office of Communications to ensure a "consistent" pro-life message. *Id.*

99.     The Diocese of Springfield also immediately seeks to hire an Associate General Counsel. According to its position description and job posting, the Associate General Counsel "serves in the capacity of an associate legal officer supporting the Chancellor and General Counsel in his role as chief legal advisor for the Diocesan Bishop, other officials of the Diocesan Curia, Diocesan pastors, and parochial administrators in basic matters of civil and canon law regarding routine Diocesan and parish activities." Diocese of Springfield Associate General Counsel Position Description, **attached as Exhibit 9** at 1.

100.    The Associate General Counsel provides advice and guidance to internal stakeholders, provides legal education to related Catholic entities, develops Diocesan policies and procedures, and represents the Diocese before courts and administrative bodies. *Id.* at 1–2.

101.    The Associate General Counsel provides advice and guidance on employment issues and disputes, including the Diocese of Springfield's response to employee reproductive decisions that undermine its mission and message.

102.    To advance the Diocese of Springfield's mission, the Associate General Counsel must be a "[p]racticing Catholic in full communion with the teachings of the Church," with the "[a]bility to display appropriate conduct as it pertains to the values of the Diocesan mission and the teachings of the Catholic Church." *Id.* at 2.

103.    The Diocese of Springfield thus believes that individuals serving in the Respect Life Advocate and Associate General Counsel positions would undermine its religious mission and message by participating in sinful reproductive decisions.

20

**II.    The Act's requirements and Plaintiffs' faith-based violations.**

   **A.    The Illinois Human Rights Act**

104.    The Illinois Legislature enacted the Illinois Human Rights Act in 1979, and the law became effective in 1980. *See* Pub. Act 81-1216 (effective July 1, 1980).

105.    Article 1 of the Act contains general provisions, including definitions and the Act's Declaration of Policy. 775 ILL. COMP. STAT. ANN. § 5/1-101, et seq.

106.    The Declaration of Policy provides that the Act applies in several contexts, including employment (Article 2), real estate (Article 3), financial credit (Article 4), public accommodations (Article 5), and education (Article 5A). *See id.* § 5/1-102(A). This lawsuit concerns the Act's application in employment (Article 2).

107.    Before the New Bill, the Declaration of Policy prohibited "unlawful discrimination" based on 14 protected characteristics: "race, color, religion, sex, national origin, ancestry, age, order of protection status, marital status, physical or mental disability, military status, sexual orientation, pregnancy, or unfavorable discharge from military service . . . ." *Id.* §§ 5/1-102(A), 5/1-103(Q).

108.    Plaintiffs face a credible threat and substantial risk that they will be investigated or prosecuted for their faith-based policies, speech, and conduct.

109.    The State frequently and vigorously enforces the Act. The State solicits members of the public to report alleged violations of the Act through telephone and online helplines that assist callers in filing charges. *See* 775 ILL. COMP. STAT. ANN. § 5/7-101(K); *id.* § 5/2-107(a)–(d).

110.    In its Annual Report for fiscal year 2024, the Department boasted that it "received **2,906** total charges of discrimination, a 29% increase over 2,252 charges

filed in FY 2023" Ill. Dep't of Hum. Rts., 2024 Annual Report, **attached as**

**Exhibit 10** at 12 (emphasis in original).

111.   Of these 2,906 charges of discrimination in fiscal year 2024, "[t]he

majority of charges were filed in employment (80.59%)." *Id*.

112.   Beyond formally filed charges, the Department received 11,587 intake

inquiries and 7,439 public contacts during fiscal year 2024. *Id*. at 14.

113.   The Department boasts that during fiscal year 2024, it "secured"

$3,116,059 in settlements to resolve claims of discrimination and harassment. *Id*.

114.   The State punishes violations harshly. Employers who violate the Act

are subject to actual damages, cease-and-desist orders, orders to hire employees

with backpay, orders to provide employee accommodations, paying complainants'

costs and attorneys' fees, and any other action that the State considers necessary to

make the complainant whole. *See* 775 Ill. Comp. Stat. Ann. § 5/8A-104.

115.   As if these penalties weren't enough, in January 2025, the Illinois

Legislature introduced H.B. 1154 to amend the Act's remedial statute to allow for

the recovery of "punitive damages" and "all forms of relief available in tort actions,

including but not limited to, emotional distress, pain and suffering, and loss of

normal life." H.B. 1154, 104th General Assemb. (2025).

**B.     The New Bill amends the Act to expand its application to reproductive decisions.**

116.   Governor J.B. Pritzker approved the New Bill in August 2024, and it

became effective in January 2025.

117. The New Bill amends the Act's Declaration of Policy to create "reproductive health decisions" as a new protected characteristic. *See* 775 ILL. COMP. STAT. ANN. § 1-102(A).

118. The New Bill defines "reproductive health decisions" to mean "a person's decisions regarding the person's use of: contraception; fertility or sterilization care; assisted reproductive technologies; miscarriage management care; healthcare related to the continuation or termination of pregnancy; or prenatal, intranatal, or postnatal care." *Id.* § 1-103(O-5).

119. The New Bill amends the Act's definition of "unlawful discrimination" to include "discrimination against a person because of his or her actual or perceived . . . reproductive health decisions." *Id.* § 1-103(Q).

120. The legislative history of the New Bill reveals that pro-life groups were the likely targets for enforcement, showing hostility toward pro-life groups that are guided by religious beliefs but are not formally "affiliated" with a denomination. During a debate of the New Bill at the House of Representatives, Representative Patrick Windhorst asked "specifically referencing crisis pregnancy centers, whether they would be subject to liability under [sic] this Act if it's amended?" Bill sponsor Representative Anna Moeller responded that only organizations with certain religious or denominational "affiliation[s]" would be exempt. Trans. of Ill. House of Rep. Debate, **attached as Exhibit 11** at 75–76.

121. A similar colloquy occurred during a debate at the Illinois Senate when Senator Jil Tracy expressed concern that the Act's exemption for religious

employers would not protect "crisis pregnancy centers" that were "religious" or "Christian" but were not "affiliated with any particular denomination." Bill sponsor Senator Laura Fine responded that religious or Christian pregnancy centers that were not formally affiliated with a particular denomination would "unfortunately not" qualify for any religious protection.

122. Far from disavowing enforcement, Defendants cheered the New Bill and expressed their intention to zealously enforce the Act's provisions on reproductive decisions.

123. Defendant Raoul issued public remarks praising the Legislature for enacting the New Bill, affirming his zeal for enforcement, and revealing his preference for particular anti-reproductive decisions that Plaintiffs must oppose: "My office is proud to continue to partner with Gov. Pritzker's administration to draft legislation and identify new avenues to ensure Illinois is a safe haven for patients to access comprehensive abortion and gender-affirming care. I am committed to using the authority of my office to continue to defend against legal challenges to our laws that preserve Illinois as an oasis of reproductive health care." Office of the Governor, *Gov. Pritzker Signs Landmark Legislation Further Expanding Reproductive Rights in Illinois*, https://perma.cc/K868-PRC2.

124. Defendant Bennett similarly praised the New Bill in a way that reveals his preference for anti-reproductive decisions that Plaintiffs oppose: "The Supreme Court decision to overturn *Roe vs. Wade* in 2022 made clear that we cannot take any reproductive rights for granted." *Id.* "We have worked diligently

24

with the Pritzker Administration and leaders in the General Assembly to strengthen protections for reproductive rights." *Id.*

125. The Attorney General's Office has a history of targeting pro-life groups. This Court recently issued a preliminary injunction blocking the Attorney General from enforcing S.B. 1909, which threatened pro-life groups with large fines for the Orwellian charge of making statements that the Office doesn't deem "truthful." *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 701 (N.D. Ill. 2023). Although the Attorney General had not yet initiated an enforcement action on this new law, this Court held that the plaintiffs had standing and suffered a threat of prosecution: "Only fools would not have their First Amendment rights chilled under these circumstances." *Id.* at 699.

### C. Plaintiffs violate the Act's Employment Clause.

126. The Act's Employment Clause provides that it is a civil rights violation for any employer to "refuse to hire . . . or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, [or] tenure [. . .] on the basis of unlawful discrimination, citizenship status, or work authorization status." 775 Ill. Comp. Stat. Ann. § 5/2-102(A).

127. In non-regulatory guidance jointly issued by the Department and the Attorney General, Defendants interpret the Employment Clause to prohibit employers from taking "adverse action against an employee for choosing to use or not use contraception, terminating an unplanned pregnancy, or seeking treatment

25

for fertility issues, and an employer may not require an employee to engage in any of the above to obtain or retain employment." ILL. ATT'Y GEN. & ILL. DEP'T OF HUM. RTS., *Non-Regulatory Guidance* at 5 (March 2023), **attached as Exhibit 12** ("Defendants' Guidance"). Defendants say that prohibited adverse actions include (1) "[t]hreatening a pregnant employee with termination" related to a decision to "terminate their pregnancy," and (2) "[d]ischarging a pregnant employee because they requested a reasonable accommodation" to attend "appointments." *Id.* at 6.

128.    PCC of Rockford violates the Employment Clause because it refuses to hire employees based on their decisions to obtain or facilitate an abortion. PCC of Rockford Employee Handbook, Ex. 3 at 6 ("referring, assisting in the procurement of, providing, or receiving an abortion . . . is cause for refusal to hire"); *id.* at 14 (same); PCC of Rockford Conduct Policy, Ex. 4 at 3 (same).

129.    PCC of Rockford violates the Employment Clause because it conditions hiring upon employees signing an Employee Commitment form promising that they will refrain from "referring, assisting in the procurement of, providing, or receiving an abortion." PCC of Rockford Conduct Policy, Ex. 4 at 4.

130.    PCC of Rockford violates the Employment Clause because its policies subject employees to discipline—up to and including termination—based on their decisions to obtain or facilitate an abortion. PCC of Rockford Employee Handbook, Ex. 3 at 6 ("referring, assisting in the procurement of, providing, or receiving an abortion" is cause for "discipline up to and including termination"); *id.* at 14 (same); PCC of Rockford Conduct Policy, Ex. 4 at 3 (same).

131.    PCC of Rockford violates the Employment Clause because its policies threaten employees with discipline, discharge, and termination if they obtain or facilitate an abortion. PCC of Rockford Employee Handbook, Ex. 3 at 6, 14; PCC of Rockford Conduct Policy, Ex. 4 at 3.

132.    PCC of Rockford violates the Employment Clause because it imposes different requirements on individuals based on whether they have obtained or facilitated an abortion. Some of the most powerful pro-life advocates are those who repent from past reproductive decisions, but PCC of Rockford does not hire, retain, train, or apprentice any individual who has obtained or facilitated an abortion unless they complete an abortion recovery program, express repentance, and assure the PCC that the affiliation will not adversely affect its mission and message. PCC of Rockford does not impose these requirements on other employees. PCC of Rockford has imposed this requirement on volunteer apprentices covered by the Act. *See* 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(1)(b) (defining "employee" to include an apprentice, an applicant for any apprenticeship, and unpaid interns).

133.    PCC of Rockford violates the Employment Clause because it will only recruit applicants who have not—and will not—make an unrepentant decision to obtain or facilitate an abortion.

134.    PCC of Rockford chills its speech and refrains from speaking because of the Employment Clause. In light of the Act's purported prohibitions, PCC of Rockford wishes to immediately include the following statement in job postings for its current open positions: "Consistent with the Pregnancy Care Center of

Rockford's faith-based mission to promote life and avoid abortion, the Center cannot hire or retain individuals who obtain an abortion during their employment or who have obtained an abortion in the 5 years preceding their application for employment." But PCC of Rockford refrains from making this statement because the Employment Clause prohibits it from taking action in recruitment and hiring based on reproductive decisions.

135. The Diocese of Springfield violates the Employment Clause because it refuses to hire employees based on their decisions to obtain or facilitate an abortion.

136. The Diocese of Springfield violates the Employment Clause because its policies subject employees to discipline—up to and including termination—based on their decisions to obtain or facilitate an abortion. Springfield Standards of Conduct, Ex. 7 at 1 ("disciplinary action, up to and including termination" for employees failing to "conduct themselves in a moral and ethical manner consistent with Catholic principles"). *Id.* The Diocese of Springfield believes that a person violates this policy by espousing or participating in abortion, contraception, sterilization, or certain reproductive technologies that discard and destroy human life or that undermine the marital union, including IVF, ZIFT, ICSI, ovum donation, and surrogacy.

137. The Diocese of Springfield violates the Employment Clause because its policies threaten employees with discipline, discharge, and termination if they participate in reproductive decisions that violate their religious beliefs. *Id.*

28

138.    The Diocese of Springfield violates the Employment Clause because it will only recruit applicants who have not—and will not—make an unrepentant decision to obtain or facilitate an abortion. The Diocese of Springfield encourages interviewers to ask whether applicants will "avoid actions and lifestyles that are contrary to the teachings and values of the Catholic Church," noting that "living contrary to the teachings of the Catholic Church can be grounds for dismissal." *See* Diocese of Springfield Interview Questions for Parishes & Ministries, **attached as Exhibit 13** at 1; Diocese of Springfield Interview Questions for Schools, **attached as Exhibit 14** at 1–2. These questions violate the Employment Clause because they are actions taken in recruitment and hiring that distinguish applicants based on reproductive decisions.

139.    The Diocese of Springfield chills its speech and refrains from speaking because of the Employment Clause. To clarify its religious beliefs and policies in light of the New Bill, the Diocese of Springfield prepared the following statement for immediate publication on the job posting section of its website:

> Every employee, whether employed by the Diocese, a parish within the diocese, or a Catholic School, shall act in an honest and forthright manner in all workplace concerns; treat co-workers, supervisors, volunteers, parishioners, students, and visitors with respect; and conduct themselves in a moral and ethical manner consistent with Catholic principles, including but not limited to the Church's teaching on sexual ethics, human dignity, contraception, sterilization, abortion, and certain reproductive technologies that discard and destroy human life or that undermine marital union. Failure to adhere to these standards is grounds for discipline, up to and including termination.

140.    But the Diocese of Springfield refrains from publishing this statement on its website—chilling and self-censoring its religious speech—because it

reasonably fears that the statement will invite investigations and complaints under the Act.

**D.    Plaintiffs violate the Act's Offensive Speech Clause.**

141.    The Act's Offensive Speech Clause provides that it is a civil rights violation for any employer to engage in "harassment," which is defined to include "any unwelcome conduct on the basis of an individual's actual or perceived [protected characteristics] that has the purpose or effect of [1] substantially interfering with the individual's work performance or [2] creating an intimidating, hostile, or offensive working environment." 775 ILL. COMP. STAT. ANN. §§ 5/2-102(A), 5/2-101(E-1).

142.    Defendants' Guidance states that the Act prohibits "harassment based on a person's reproductive decisions, such as whether to use contraception, fertility treatments, or abortion care." Ex. 12 at 3. "Either one extremely serious act of harassment, or a series of less severe acts, could be severe or pervasive enough to constitute actionable harassment." *Id.* at 4. Defendants say that employers violate the law by using "[a]ddressing a pregnant employee with derogatory terms after learning the pregnant employee plans to have an abortion." *Id.* at 6.

143.    PCC of Rockford violates the Offensive Speech Clause by engaging in pervasive and severe speech and conduct to express its message that all life is sacred and that sex should be reserved for marriage.

144.    PCC of Rockford's expression is pervasive because it occurs daily and in many contexts, including counseling meetings, telephone calls with clients and

30

community members, educational presentations, internal leadership meetings, internal staff meetings, internal emails, internal conferences and retreats, on its website, and through digital and print media.

145.   PCC of Rockford's expression is severe because it communicates a message that a person's decision to obtain or facilitate an abortion is immoral, sinful, unjustified, and is murder of a human life—terms that are generally considered unwelcome, offensive, hostile, or derogatory.

146.   PCC of Rockford's Staff Nurse engages in expressive activity that violates the Act's Offensive Speech Clause through pervasive and severe communications with clients and internal stakeholders to advance the PCC of Rockford's pro-life message. PCC of Rockford Staff Nurse Position Description, Ex. 5 at 1–2; *see supra* ¶¶ 58–62.

147.   PCC of Rockford's Receptionist engages in expressive activity that violates the Act's Offensive Speech Clause through pervasive and severe communications with clients and internal stakeholders to advance the PCC of Rockford's pro-life message. PCC of Rockford Receptionist Position Description, Ex. 6 at 1–2; *see supra* ¶¶ 63–65.

148.   The Diocese of Springfield violates the Offensive Speech Clause by engaging in pervasive and severe speech and conduct to express its message that all life is sacred and that the marital act must be open to life.

149.   The Diocese of Springfield's expression is pervasive because it occurs daily and in many contexts, including homilies, encouragement during confession,

spiritual counseling, marriage counseling, religious conferences and programs,
Respect Life events, life marches, internal meetings and conversations among
diocesan leadership, internal staff meetings, internal emails, internal conferences
and retreats, on its website, and through digital and print media.

150. The Diocese of Springfield's expression is severe because it
communicates a message that a person's objectionable reproductive decisions are
mortally sinful, immoral, unreasonable, unjust, unloving, contrary to eternal
salvation, and comparable to committing murder by hiring hitmen and contract
killers—terms and comparisons that are generally considered unwelcome, offensive,
hostile, or derogatory.

151. The Diocese of Springfield's Office of Marriage and Family Life violates
the Offensive Speech Clause through its frequent statements that marriage and the
conjugal act must be open to life, such that contraception, sterilization, abortion,
and objectional reproductive treatments are sinful, immoral, and unjust.

152. The Diocese of Springfield's Office for Pro-Life Activities violates the
Offensive Speech Clause through its frequent statements that abortion,
contraception, sterilization, IVF, and other reproductive technologies are sinful,
immoral, and unjust.

153. The Diocese of Springfield's Respect Life Advocate engages in
expression that violates the Act's Offensive Speech Clause through pervasive and
severe speech and conduct to express the message that all life is sacred and that the

marital act must be open to life. Diocese of Springfield Respect Life Advocate Position Description, Ex. 8 at 1–2; *see supra* ¶¶ 95–100.

154. The Diocese of Springfield's Associate General Counsel also engages in expression that violates the Act's Offensive Speech Clause through pervasive and severe speech and conduct to express the message that all life is sacred and that the marital act must be open to life. Diocese of Springfield Associate General Counsel Position Description, Ex. 9 at 1–2; *see supra* ¶¶ 101–04.

155. Both Plaintiffs address their pro-life message to their employees, and their employees are surrounded by pro-life expression toward external audiences.

**E. Plaintiffs violate the Act's Accommodation Clause.**

156. The Act's Accommodation Clause provides that it is a civil rights violation "for an employer to not make reasonable accommodations for any medical or common condition of a job applicant or employee related to pregnancy or childbirth, unless the employer can demonstrate that the accommodation would impose an undue hardship on the ordinary operation of the business of the employer." 775 ILL. COMP. STAT. ANN. § 5/2-102(J)(1). In this context, "reasonable accommodations" include "time off to recover from conditions related to childbirth and leave necessitated by pregnancy, childbirth, or medical or common conditions resulting from pregnancy or childbirth." *Id.* § 5/2-102(J).

157. Defendants' Guidance provides that employers violate the Accommodation Clause by (1) "[d]enying a pregnant employee's request to use time off for abortion care," and (2) "denying a person a request for scheduled medical

time off when that person is seeking fertility treatments, while permitting those not seeking fertility treatments to take medical time off for a dental appointment." Defendants' Guidance, Ex. 12 at 6–7.

158.   Plaintiffs violate the Accommodation Clause because they do not—and will not—grant employee requests for accommodations related to reproductive decisions that violate their religious beliefs.

159.   PCC of Rockford provides up to two weeks of paid medical leave in connection with pregnancy, childbirth, or any major medical condition, but consistent with its religious beliefs, it does not grant leave or other accommodations related to abortion. *See* PCC of Rockford Employee Handbook, Ex. 3 at 11–12.

160.   The Diocese of Springfield also denies requests for accommodation—including time off—for employees to obtain an abortion, sterilization, contraception, or certain reproductive treatments that discard and destroy human life or that undermine the marital union, including IVF, ZIFT, ICSI, ovum donation, and surrogacy.

### F.   Plaintiffs violate the Act's Benefit Clause.

161.   The Act's Benefit Clause provides that it is a civil rights violation for any employer "to act with respect to . . . terms, privileges or conditions of employment on the basis of unlawful discrimination." 775 ILL. COMP. STAT. ANN. § 5/2-102(A).

162.   Defendants' Guidance provides that employers violate the Benefit Clause "[d]enying a pregnant employee's request to use time off for abortion care,"

34

and (2) "denying a person a request for scheduled medical time off when that person is seeking fertility treatments, while permitting those not seeking fertility treatments to take medical time off for a dental appointment." Defendants' Guidance, Ex. 12 at 6–7.

163.    Plaintiffs violate the Benefit Clause because they offer employees benefits in the form of time off from work, but they do not provide or allow time off related to objectionable reproductive decisions. *See supra* ¶¶ 158–60.

164.    The Diocese of Springfield also violates the Benefit Clause because its employee health plans cover reproductive services that it condones, but the Diocese of Springfield does not—and will not—cover abortion, contraception, sterilization, or certain reproductive technologies that discard and destroy human life or that undermine the marital union, including IVF, ZIFT, ICSI, ovum donation, and surrogacy.

### G.    Plaintiffs violate the Act's Notice Clause.

165.    The Act's Notice Clause provides that it is a civil rights violation for any employer to "[1] fail to post or keep posted in a conspicuous location on the premises of the employer where notices to employees are customarily posted, or [2] fail to include in any employee handbook information concerning an employee's rights under this Article, a notice, to be prepared or approved by the Department, summarizing the requirements of this Article and information pertaining to the filing of a charge, including the right to be free from unlawful discrimination, the

35

right to be free from sexual harassment, and the right to certain reasonable accommodations." 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1).

166.    Defendants' Guidance clarifies that employers must provide notice of the Act's requirements in *both* workplace posters *and* employee handbooks. Defendants' Guidance, Ex. 12 at 7.

167.    Both Plaintiffs maintain employee handbooks.

168.    Both Plaintiffs have workplaces where notices are customarily posted.

169.    But Plaintiffs do not—and will not—broadcast or include the Act's requirements about reproductive decisions in their employee handbooks or on workplace posters.

170.    Plaintiffs believe that such a notice would communicate a lie that their employees may make objectionable reproductive decisions free from adverse action, without encountering pervasive and severe pro-life communication, and assisted by ministry benefits and accommodations.

171.    Plaintiffs also believe that such a notice would communicate a lie that the Constitution and relevant laws require them to comply with the Act's requirements about reproductive decisions.

## III.    Defendants refuse to accommodate Plaintiffs' religious beliefs.

### A.    Defendants refuse to apply a statutory religious exclusion to religious employers.

172.    Article 2 of the Act only applies to "employers," which the Act broadly defines to include "[a]ny person employing one or more employees within Illinois

36

during 20 or more calendar weeks within the calendar year of or preceding [an] alleged violation." 775 ILL. COMP. STAT. ANN. § 5/2-101(B)(1).

173. But the Act contains a statutory exclusion for religious organizations: "'Employer' *does not include* any place of worship, religious corporation, association, educational institution, society, or non-profit nursing institution . . . with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such place of worship, corporation, association, educational institution, society or non-profit nursing institution of its activities." *Id.* § 5/2-101(B)(2) (emphasis added). As explained below, Defendants refuse to apply this exclusion to Plaintiffs.

174. The Act clarifies that "with respect to employers," the word "religion" includes "all aspects of religious observance and practice, as well as belief . . . ." *Id.* § 5/2-101(F).

175. Defendants should apply this religious exclusion to Plaintiffs' conduct in matters of reproduction.

176. Defendants do not apply this religious exclusion to Plaintiffs' conduct in matters of reproduction.

177. Plaintiffs are religious corporations and places of worship, and they wish to exercise their religion on reproductive matters "with respect to the employment of individuals of [their] particular religion" who "perform the work connected with carrying on" their religious organizations. *See id.* § 5/2-101(A)(2).

178.    It is the exclusive prerogative of religious organizations like Plaintiffs—not of legislatures, courts, or executive officials like Defendants—to decide what is necessary or sufficient for an individual to be "of" their particular religion, to decide who is necessary or dispensable in "carrying on" its mission, or to decide what is necessary or sufficient to align with their religious observances, practices, and beliefs. *See e.g., Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds").

179.    Plaintiffs believe that individuals "of" their particular religion are those who respect and abide by their religious beliefs about reproductive matters.

180.    Plaintiffs believe that the "carrying on" of their organizations includes employee speech and conduct to promote their beliefs about reproductive matters.

181.    Nonetheless, Defendants do not apply the statutory exclusion to religious employers' speech and conduct regarding reproductive matters.

182.    Defendants narrowly interpret the statutory religious exclusion to only foreclose charges of discrimination based on religion when religious organizations limit positions to people who identify as adherents to the same denomination. For example, Attorney General Kwame Raoul joined an amicus brief to argue that Title VII's identical statutory religious exemption allows religious organizations to give preference to coreligionists, but does not authorize religious organizations to discriminate against employees based on any other protected ground—like

38

reproductive decision-making—"even if such discrimination is consistent with (or mandated by) religious tenets" *See* Brief of Amici Curiae Virginia, Illinois, et al., *Our Lady of Guadalupe*, at 8, https://perma.cc/FP8L-EKFR.

183. Defendants' narrow interpretation of the religious exemption ignores the plain text of the statute and substitutes *the government's* conception of what is needed to be "of" a particular religion in place of religious organizations, showing suspicion and hostility toward religion.

## B. Defendants reject requests for religious exemptions and confirm that they will enforce the Act against Plaintiffs.

184. Along with its refusal to apply the statutory religious exemption above, the State rejected multiple requests for religious exemptions and expressly stated its intention to apply the New Bill against religious organizations.

185. On March 26, 2024, Robert Gilligan, Executive Director of the Catholic Conference of Illinois, emailed Jason Rosenweig, the Department's Director of Legislative Affairs and Policy, asserting that the First Amendment prohibits the government from applying the Act's provisions about reproductive decisions to religious organizations' faith-based speech, conduct, and exercise of religious autonomy. Email from Robert Gilligan to IDHR, **attached as Exhibit 15**.

186. In that email, the Catholic Conference urged that "to impose the reproductive health care decision claims on actual religious [organizations]" would mean "entering a 'religious thicket,' in the words of the *Milivojevich* case." *Id.* (referencing *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 719 (1976)). "The very process of trying to figure what is, and what is

not religious in sifting claims arising from that venue would violate the anti-entanglement provisions of the establishment clause (per *NLRB v. Catholic Bishop*) and/or interfere with our internal doctrinal speech in violation of the free exercise clause." *Id.* (referencing *N.L.R.B. v. Cath. Bishop of Chicago*, 440 U.S. 490 (1979)).

187.    To address these constitutional concerns, the Catholic Conference offered two recommendations to amend the New Bill. *Id.* The first would have clarified that the statutory exclusion to the definition of "employer" applies to the reproductive health decisions of any individuals employed to perform work connected with the carrying on of religious organizations. *Id.* The second would have added language to the "exemption" section of Article 2 of the Act, 775 ILL. COMP. STAT. ANN. § 5/2-104, to clarify that nothing in the Act would prohibit an employer that is an expressive association from considering the reproductive decisions of its employees or applicants. *Id.*

188.    On March 29, 2024, the Department official responded in an email summarily rejecting all of the Catholic Conference's recommendations. *Id.* The Department clarified that "[w]e think that the application of these protections, existing and new, to religious organizations has been and will continue to be appropriate . . . ." *Id.* "[O]ur view is that the harms or concerns you expressed are not reasons to exempt religious organizations, with a principal reason being that religious organizations must already contend with the issues and scenarios you mentioned around gender identity and sexual orientation, which are already fully protected classes in the [Act] that do not carry exemptions like your proposals." *Id.*

**LEGAL ALLEGATIONS**

189.    Plaintiffs are subject to and must comply with the Act's requirements concerning reproductive decisions.

190.    The Act's provisions concerning reproductive decisions violate Plaintiffs' constitutional rights, and chill and deter them from exercising their constitutional rights.

191.    As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm, entitling them to declaratory and injunctive relief.

192.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of their constitutional rights.

193.    Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm.

**CLAIMS FOR RELIEF**

**COUNT I**
**First Amendment – Expressive Association**
**(42 U.S.C. § 1983)**

194.    Plaintiffs incorporate by reference paragraphs 1–193.

195.    The First Amendment protects the freedom to associate.

196.    The First Amendment also protects the right to *not* associate with those who negatively affect one's mission or message.

197.    Plaintiffs engage in expressive activity when they associate with their employees, decline to associate with prospective employees, communicate and

41

interact with the public, provide counseling and other services, and advocate for their pro-life mission and message.

198.    Because they wish to carry out their respective missions and spread their pro-life messages successfully, Plaintiffs hire and retain employees who avoid reproductive decisions that undermine their identity, mission, and message. For Plaintiffs, the credibility of their messengers is as important as the message.

199.    The Act's Employment, Offensive Speech, and Notice Clauses severely burden Plaintiffs' freedom of expressive association by forcing them to form associations and assemblies with employees whose reproductive decisions undermine their mission and message, by denying them the right to organize their employees to promote their desired message, by restricting their ability to communicate that message to prospective and current employees, by restricting their ability to require prospective employees and employees to act consistent with their values, by restricting their ability to take adverse actions against prospective and current employees who do not share and speak and act consistent with their mission and message, by restricting their ability to effectively promote their mission and message, and by compelling them to alter their employee handbooks and other documents that describe objectionable reproductive decisions as gravely sinful.

200.    The Act's Accommodation and Benefits Clauses also severely burden Plaintiffs' freedom of expressive association by forcing them to cooperate in and associate with activities through their provision of accommodations and benefits that violate their mission and message.

42

201.    The Employment, Offensive Speech, Accommodation, Benefit, and Notice Clauses regulate expressive association based on content, viewpoint, and speaker identity.

202.    By forcing Plaintiffs to hire and retain employees who make reproductive decisions that undermine their fundamental mission and message, the Act threatens and undermines the very mission of Plaintiffs' organizations.

203.    The Act's requirements also chill Plaintiffs' intended speech and ability to immediately advertise and fill employment positions with individuals that abide by their organizations' beliefs.

204.    The application of the Act to Plaintiffs does not advance any compelling governmental interest.

205.    The Act is not narrowly tailored to advance any compelling governmental interest, and the Act is not the least restrictive means of achieving any such interest.

## COUNT II
### Violation of the First Amendment—Free Exercise Clause
### (42 U.S.C. § 1983)

206.    Plaintiffs incorporate by reference paragraphs 1–193.

207.    The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise of religion."

208.    Plaintiffs exercise their religion in their provision of pro-life counseling, advocacy, material resources, medical services, and the communication of information about reproduction and marriage. Plaintiffs also exercise their

43

religion by employing individuals who share and live out their beliefs about reproduction and marriage.

209.    The Act substantially burdens Plaintiffs' right to the free exercise of religion by prohibiting faith-based speech and conduct related to reproduction, interfering with their faith-based employment decisions, and forcing Plaintiffs to revise their statements of faith, positional statements, codes of conduct, employee handbooks, and other policy documents.

210.    The Act also infringes on the hybrid of Plaintiffs' free exercise, free speech, expressive association, and assembly rights.

### *The Act is not neutral or generally applicable*

211.    The Act is not neutral and generally applicable for at least seven reasons.

212.    *First*, while Plaintiffs must discharge the Act's obligations toward all of their employees, the Act exempts other employers from complying with the Act because their workers are carefully carved out of the definition of "employee."

213.    The Act broadly defines "employee" to include "any individual performing services for remuneration within this State for an employer." 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(1). But the Act's definition of "employee" contains special exclusions for some workers. "Employee" does not include: (1) individuals "employed by persons who are not 'employers' as defined by this Act"; (2) elected public officials or the members of their immediate personal staffs; (3) principal administrative officers of the State or of any political subdivision, municipal

44

corporation or other governmental unit or agency; and (4) a person in a vocational rehabilitation facility certified under federal law who has been designated an evaluee, trainee, or work activity client. *Id.*

214.    Thus, the State allows exceptions to the Act's application by excluding certain workers from the definition of "employee," yet the State refuses to extend a similar exclusion for Plaintiffs.

215.    *Second*, the Act contains dozens of special exemptions that limit the Act's application, appearing in multiple statutes appropriately titled, "exemptions." 775 ILL. COMP. STAT. ANN. § 5/2-104 ("exemptions" for employment); *id.* § 5/3-106 ("exemptions" for real estate); *id.* § 5/4-104 ("exemptions" for financial credit); *id.* § 5/5-103 ("exemption" for public accommodations).

216.    The "exemptions" statute in Article 2 (employment) includes at least 14 exemptions, providing that "[n]othing contained in this Act shall prohibit an employer, employment agency, or labor organization from" hiring or selecting between persons for bona fide occupational qualifications (BFOQ), refusing to hire or retain firefighters/paramedics based on age, refusing to hire or retain employees based on ability tests, giving preferential treatment to veterans, and considering unfavorable military discharge. 775 ILL. COMP. STAT. ANN. § 5/2-104(A).

217.    The "exemptions" statute in Article 2 (employment) also provides a complete exemption to the application of the Act for all employees who were subject to a collective bargaining agreement before the Act's enactment. *Id.* § 5/2-104(B).

218. The "exemptions" statute in Article 2 (employment) also allows employers to adopt and enforce policies to prohibit the use of drugs or alcohol in the workplace, yet the Act forbids Plaintiffs from adopting and enforcing policies prohibiting the use of abortion drugs and procedures tantamount to murder under their religious beliefs. *Id.* § 5/2-104(C)(3).

219. The "exemptions" statute in Article 2 (employment) also provides an exemption from employers' obligation to make accommodations or modifications—including leave, scheduling, and attendance—to reasonable workplace rules or policies for an employee based on "family responsibilities." *Id.* § 5/2-104(E).

220. The "exemptions" statute in Article 3 (real estate) includes at least 14 exemptions, providing that "[n]othing contained in [the statute listing civil rights violations in real estate] shall prohibit" restricting the rental of rooms to persons of one sex, refusal to rent owner-occupied property based on a person's sexual orientation, refusal to sell or rent property by using arrest records and immigration status, refusal to sell or rent property based on child sex offender status, private sales of single-family homes, rental of small owner-occupied apartments, rental of rooms in owner-occupied homes, and religious organizations' sale of property to coreligionists, among others. 775 ILL. COMP. STAT. ANN. § 5/3-106.

221. The "exemptions" statute in Article 4 (financial credit) includes three wholesale exemptions, providing that "nothing contained in this Article shall prohibit" financial institutions from (1) considering sound underwriting practices, including discretionary determination of "the willingness and the financial ability of

the borrower to repay the loan"; (2) determining credit-worthiness by asking about age, immigration status, or "any additional information" and using credit systems to determine credit-worthiness; and (3) denying credit under credit assistance programs. *See* 775 ILL. COMP. STAT. ANN. § 5/4-104.

222.    The "exemption" statute in Article 5 (public accommodations) includes three wholesale exemptions, providing that "nothing in this Article shall apply to" (1) private clubs; (2) distinctly private facilities (as to discrimination based on sex); and (3) inns, hotels, and rooming houses (as to discrimination based on sex). *See* 775 ILL. COMP. STAT. ANN. § 5/5-103.

223.    For public accommodations—but not for employers—the Act exempts the expression of religious views. "With respect to a place of public accommodation defined in paragraph (11) of Section 5-101, the exercise of free speech, free expression, free exercise of religion or expression of religiously based views by any individual or group of individuals that is protected under the First Amendment to the United States Constitution or under Section 3 of Article I, or Section 4 of Article I, of the Illinois Constitution, shall not be a civil rights violation." 775 ILL. COMP. STAT. ANN. § 5/5-102.1(b).

224.    Thus, the Act contains dozens of special exemptions, but the State refuses to grant a religious exemption to Plaintiffs.

225.    *Third*, the Act is not neutral and generally applicable because it involves a system of individualized assessments on whether an employer's conduct constitutes "harassment." Defendants must make individualized, discretionary, and

47

subjective assessments on whether each employer's speech and conduct related to reproductive decisions are "unwelcome" and whether they give rise to an "intimidating, hostile, or offensive" working environment. 775 ILL. COMP. STAT. ANN. § 5/2-101(E-1). The Act does not define these terms and Defendants exercise unbridled discretion in deciding whether Plaintiffs violate the Act.

226. *Fourth*, the Act is not neutral and generally applicable because it involves a system of individualized assessments on whether an employer's hiring qualification—here, avoiding objectionable (and unrepentant) reproductive decisions—is a "bona fide occupational qualification" (BFOQ) exempt from the Act. As explained above, Plaintiffs believe that their missions depend upon only hiring and retaining employees who avoid objectionable reproductive decisions, but the BFOQ exemption "is a narrow one," and "is available only when the employer can show that no one in the excluded class is capable of performing the duties essential to the job." *River Bend Cmty. Unit Sch. Dist. No. 2 v. Hum. Rts. Comm'n*, 232 Ill. App. 3d 838, 844 (1992). Defendants have unbridled discretion to determine whether avoiding objectionable reproductive decisions is religious or "essential" enough to Plaintiffs' work, a determination which itself intrudes on Plaintiffs' religious autonomy.

227. *Fifth*, the legislative history of the New Bill reveals the targeting of pro-life groups and hostility toward religious organizations that are guided by religious beliefs but are not formally "affiliated" with a particular denomination.

48

228.    *Sixth*, the application of the Act to Plaintiffs shows religious hostility because Defendants could—but don't—apply a readily available statutory religious exemption to Plaintiffs' employment conduct. As explained above, the Act does not apply to religious organizations "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on . . . its activities." 775 ILL. COMP. STAT. ANN. § 5/2-101(B)(2). The Act clarifies that "with respect to employers," the word "religion" includes "all aspects of religious observance and practice, as well as belief . . . ." 775 ILL. COMP. STAT. ANN. § 5/2-101(F). Plaintiffs satisfy the plain language of this exemption, and Defendants show religious hostility and skepticism by refusing to apply it to Plaintiffs' religious speech and conduct about reproduction.

229.    *Seventh*, Defendants showed religious hostility toward religion when they rejected multiple requests for religious exemptions from the Catholic Conference of Illinois, which represents the Diocese of Springfield. As explained above, in March 2024, the Catholic Conference of Illinois requested exemptions to avoid violation of Plaintiffs' constitutional rights. *See* Email from Robert Gilligan, Ex. 15. The Department rejected the requests without even addressing the constitutional concerns, stating that "the harms or concerns you expressed are not reasons to exempt religious organizations" because the Department already imposes *even more* regulations without exemptions governing religious employers' conduct related to gender identity and sexual orientation. *Id*. Thus, Defendants also evinced religious hostility by ignoring Plaintiffs' constitutional concerns and refusing a

religious exemption simply because the State has already heaped burdens upon Plaintiffs' religious exercise.

230.   In sum, the Act is not neutral and generally applicable because it allows exemptions and more favorable treatment to similar secular conduct, involves mechanisms for individualized assessments, and reflects religious hostility.

231.   The Act thus triggers strict scrutiny, but the Act is not narrowly tailored to advancing a compelling governmental interest.[2]

## COUNT III
### Violation of the First Amendment—Religion Clauses
### Religious Autonomy, Ministerial Exception, Co-religionist Doctrine
### (42 U.S.C. § 1983)

232.   Plaintiff incorporates by reference paragraphs 1–193.

233.   The Religion Clauses of the First Amendment protect the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

234.   The religious autonomy doctrine (or "church autonomy" doctrine) ensures that religious organizations retain "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020).

---

[2] In the alternative, this case demonstrates that *Smith* should be overruled because its test "provides no protection" from laws that have "a devastating effect on religious freedom . . . ." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 545 (2021) (Alito, J., joined by Thomas & Gorsuch, JJ., concurring). Plaintiffs preserve this argument for appeal.

235.    This right to religious (or "church") autonomy safeguards a religious organization's decision about which officers, board members, employees, and volunteers are best suited to advance its religious mission and purpose.

236.    This freedom extends to Plaintiffs' ability to hire and employ only those who believe—and live out—the beliefs of their organizations about reproductive health decisions such as abortion, sterilization, and contraception.

237.    The ministerial exception is one component of this autonomy and "ensures that the authority to select and control who will minister to the faithful . . . is the church's alone." *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 194–95 (2012).

238.    The ministerial exception forbids the government from interfering with Plaintiffs' employment decisions about its "ministerial" employees.

239.    Defendants cannot second-guess Plaintiffs' decisions about its ministerial employees (whatever the reason), nor can they penalize Plaintiffs for those decisions. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060.

240.    Many of Plaintiffs' employees qualify as "ministerial" employees under Supreme Court precedent because they must counsel pregnant women and their families, and they must teach others—through word and deed—about Christian doctrines, including teachings about reproduction. In other words, they are ministerial employees because they are responsible for "transmitting the [Christian] faith" to others. *Our Lady of Guadalupe*, 140 S. Ct. at 2063 (quoting *Hosanna-Tabor*, 565 U.S. at 192).

51

241. For those employees of Plaintiffs who do not qualify as "ministerial" employees, the First Amendment still protects Plaintiffs' ability to require adherence to religious teachings and standards of conduct on reproduction because doing so is rooted in the ministry's religious beliefs and practices. *See, e.g.*, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002) (religious institution has right to make "personnel decision[s] based on religious doctrine" even when the decision does not involve a ministerial employee).

242. Plaintiffs have determined that they must hire and retain individuals who do not undermine their mission and message through objectionable reproductive decisions.

243. The Act interferes with Plaintiffs' religious autonomy by preventing them from only hiring and retaining employees who abide by their religious beliefs.

244. The Act interferes with Plaintiffs' religious autonomy by preventing them from enforcing their statements of faith, standards of conduct, and other policies consistent with their religious beliefs.

245. The Act interferes with Plaintiffs' religious autonomy to separate themselves from individuals who commit acts that they believe to be immoral, which causes scandal and fatally undermines their mission and message.

246. The Act interferes with Plaintiffs' religious autonomy to decide the extent to which prospective and current employees must adhere to religious beliefs.

247. The Act interferes with Plaintiffs' religious autonomy to decide what messages to foster in the workplace—and how pervasively and severely—by subjecting such speech and conduct to charges of "harassment."

248. The Act interferes with Plaintiffs' religious autonomy to decide whether to grant or deny requests for accommodations consistent with their religious beliefs.

249. The Act interferes with Plaintiffs' religious autonomy to decide whether to provide or withhold employment benefits—like coverage for abortion—consistent with their religious beliefs.

250. The Act interferes with Plaintiffs' religious autonomy by forcing Plaintiffs to speak the government's message by requiring them to broadcast the Act's requirements on reproductive health decisions in their employee handbooks.

251. The Act interferes with the Plaintiffs' religious autonomy to proclaim and advocate for many integrated teachings, of which Christian teachings about reproduction are one indispensable part.

252. The Act imposes severe coercive pressure on Plaintiffs—including state enforcement actions and crippling private lawsuits—to change how they order and manage their internal affairs.

253. As applied to Plaintiffs, the Act violates the right to religious autonomy, the ministerial exception, and the co-religionist doctrine.

254. The Act does not advance any compelling governmental interest.

255. The Act is not narrowly tailored to advance any compelling governmental interest, and the law is not the least restrictive means of achieving any such interest.

## COUNT IV
### Violation of the First Amendment—Free Speech Clause
### Chilled Speech; Compelled Speech; Content and Viewpoint Restrictions
### (42 U.S.C. § 1983)

256. Plaintiffs incorporate by reference paragraphs 1–193.

257. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."

258. The Act, as amended by the New Bill, unconstitutionally restricts Plaintiffs' right to free speech because it forbids them from maintaining and communicating employment standards of conduct according to their organizational beliefs about reproduction.

259. The Act also restricts Plaintiffs' right to free speech because it compels them to speak a message contrary to their beliefs not only to their current employees but also to prospective employees and the public in general.

260. The speech prohibitions in the Act require Plaintiffs to limit and censor their constitutionally guaranteed speech about the impropriety of abortion and other reproductive decisions.

261. In addition, the Act unconstitutionally compels Plaintiffs' speech by requiring them to broadcast "information concerning an employee's rights under [the Act]" in their employee handbooks and in a conspicuously placed poster on in Plaintiffs' workplaces. 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1).

54

262. To clarify their religious beliefs and employee requirements under the Act's recent amendment, Plaintiffs have prepared statement for publication in their job postings and on their websites, clarifying that applicants and employees must adhere to their religious beliefs about reproductive decisions.

263. Plaintiffs have refrained from publishing these statements explaining their religious requirements because Plaintiffs fear invasive investigations and charges of discrimination under the Act.

264. By requiring this speech in Plaintiffs' employee handbooks and workspaces, the Act unconstitutionally compels Plaintiffs to encourage their employees to use the statute.

265. Plaintiffs have employee handbooks that articulate employee requirements.

266. Plaintiffs wish to include a statement in their employee handbooks and job postings that all employees must agree to adhere to their religious beliefs on reproductive choices, but they refrain from including these statements due to fear of investigation and charges under the Act.

267. Plaintiffs refuse to broadcast the Act's purported requirements about reproductive decisions in their employee handbooks, workplace posters, or otherwise.

268. The Act is also a content-based regulation of speech because its application is based on the topic discussed or the idea or message expressed—here, the reproductive decisions of employees.

269.    The Act is also a content-based regulation of speech because it alters the speech and message that Plaintiffs would otherwise engage in.

270.    The Act also unconstitutionally discriminates against Plaintiffs' speech based on their viewpoint because it permits speech communicating the idea that reproductive choices should have nothing to do with employment, while it prohibits speech communicating the idea that employees must personally abide by pro-life codes of conduct to be employed by pro-life organizations.

271.    The Act triggers strict scrutiny because it chills speech, compels speech, and restricts speech based on content and viewpoint.

272.    The Act fails strict scrutiny because it is not narrowly tailored to advance any compelling governmental interest.

## COUNT V
## Violation of the Fourteenth Amendment
## Equal Protection Clause
## (42 U.S.C. § 1983)

273.    Plaintiffs incorporate by reference paragraphs 1–193.

274.    The Equal Protection Clause of the Fourteenth Amendment protects against invidious discrimination.

275.    Plaintiffs are similarly situated to secular employers whose employment relationships are exempt from the application of the Act.

276.    Defendants have treated other employers more favorably than Plaintiffs.

277.    The Act provides many exemptions to its application for favored secular employers and employment arrangements.

56

278. Defendants summarily rejected multiple requests for religious exemptions to the Act's provisions about reproductive decisions.

279. Defendants refuse to apply a readily available statutory religious exemption to Plaintiffs' faith-based employment speech and conduct related to reproductive decisions.

280. Because Defendants' disparate treatment of Plaintiffs infringes on Plaintiffs' First Amendment rights, discriminatory intent is presumed.

281. Defendants' application of the Act's provisions about reproductive decisions to Plaintiffs' religious speech and conduct violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

A. A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from investigating or otherwise enforcing the Act against Plaintiffs in connection with Plaintiffs' speech and conduct related to reproductive decisions;

B. A declaration that the application of the Act to Plaintiffs' speech and conduct related to reproductive decisions, violates the First and Fourteenth Amendments.

C. Retain jurisdiction of this matter for the purpose of enforcing its orders;

D.     Award Plaintiffs' costs and expenses in this action, including

reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

E.     Award any other relief this Court deems equitable, just, and proper.


Dated:  March 20, 2025

s/ David A. Cortman

Mark Lippelmann, AZ Bar No. 036553*
   mlippelmann@ADFLegal.org
Ryan Tucker, AZ Bar No. 034382*
   rtucker@ADFLegal.org
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

David Cortman, N.D. Ill. Bar No. 188810
   dcortman@ADFLegal.org
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road, NE Suite
D-1100
Lawrenceville, GA 30043
(770) 339-0774

Whitman H. Brisky, IL Bar No. 1665634
   wbrisky@mauckbaker.com
**MAUCK & BAKER, LLC**
1 North LaSalle Street, Ste. 3150,
Chicago, IL 60602
(312) 726-1243

*Attorneys for Plaintiffs*
*\*Pro Hac Vice Application Pending*

## VERIFICATION OF COMPLAINT

I, Nicole Tibbetts, a citizen of the United States and a resident of Illinois, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations in it, and the facts as alleged as to Plaintiff The Pregnancy Care Center of Rockford are true and correct.

Executed on March 18, 2025, in Rockford, Illinois.

Nicole Tibbetts
Executive Director

59

## VERIFICATION OF COMPLAINT

I, James Bock, a citizen of the United States and a resident of Illinois, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations in it, and the facts as alleged as to Plaintiff The Diocese of Springfield in Illinois are true and correct.

Executed on March *17*, 2025, in Springfield, Illinois.

James Bock
Chancellor and General Counsel

60