**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

**THE PREGNANCY CARE CENTER OF ROCKFORD; THE DIOCESE OF SPRINGFIELD IN ILLINOIS**,

Plaintiffs,

v.

**JAMES BENNETT**, in his official capacity as Director of the Illinois Department of Human Rights; **KWAME RAOUL**, in his official capacity as Illinois Attorney General,

Defendants.

Case No.: 3:25-cv-50127

Hon. Rebecca R. Pallmeyer

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Oral Argument Requested**

## TABLE OF CONTENTS


Table of Authorities ........ ii

Introduction ........ 1

Intervening Factual Developments ........ 2

Legal Standard ........ 5

Argument ........ 7

I. Plaintiffs have standing. ........ 7

A. Plaintiffs allege completed and ongoing chilled-speech injuries. ........ 7

B. Plaintiffs allege a credible threat of imminent injuries. ........ 9

1. Plaintiffs' religious conduct arguably violates many provisions of the Act. ........ 9

2. Plaintiffs face a credible threat of enforcement. ........ 14

3. The Act undermines Plaintiffs' religious missions. ........ 16

C. Plaintiffs' claims are ripe. ........ 17

D. Jurisdictional discovery is unnecessary and improper. ........ 18

II. Plaintiffs state a claim—and are likely to succeed—on each of their causes of action. ........ 19

A. The Act violates Plaintiffs' right to expressive association. ........ 19

1. Like other First Amendment rights, expressive association applies in the employment context. ........ 20

2. The Act burdens Plaintiffs' expression. ........ 23

B. The Act violates the Free Exercise Clause. ........ 24

1. The Act is not generally applicable. ........ 24

2. The Act is not neutral ........ 27

C. The Act violates the Church Autonomy Doctrine and its Ministerial Exception. ........ 29

D. The Act violates Plaintiffs' right to free speech. ........ 33

E. Plaintiffs' Equal Protection claim survives dismissal. ........ 37

III. Plaintiffs satisfy the other preliminary injunction factors. ........ 39

Conclusion ........ 40

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........ 15, 20, 22

*American Civil Liberties Union of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ........ 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 6, 38

*Babbitt v. United Farm Workers National Union*,
442 U.S. 289 1979) ........ 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) ........ 16, 17, 19, 23

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ........ 10, 14, 15, 35

*Bryce v. Episcopal Church in the Diocese of Colorado*,
289 F.3d 648 (10th Cir. 2002) ........ 32

*Christian Healthcare Centers, Inc. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) ........ 16

*Christian Legal Society v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........ 16, 17, 19, 20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........ 26, 39

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ........ 1

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ........ 20, 21, 27

*Covenant Media of Illinois, L.L.C. v. City of Des Plaines, Illinois*,
391 F. Supp. 2d 682 (N.D. Ill. 2005) .................................................................. 5

*Darren Patterson Christian Academy v. Roy*
699 F. Supp. 3d 1163 (D. Colo. 2023) ................................................................ 20

*Demkovich v. St. Andrew the Apostle Parish Calumet City*,
3 F.4th 9681 (7th Cir. 2021) ........................................................................ 33, 35

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................................... 39

*Evergreen Association, Inc. v. Hochul*,
2025 WL 359074 (N.D.N.Y. Jan. 31, 2025) ........................................................ 12

*Evergreen Association, Inc. v. City of New York*,
2025 WL 416903 (E.D.N.Y. Feb. 6, 2025) .......................................................... 12

*Fincantieri U.S.A. Inc. v. Noonan*,
2020 WL 607572 (E.D. Wis. Feb. 7, 2020) ......................................................... 19

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) ................................................................................ 25

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ................................................................................ 24, 25, 26, 27

*Green v. Miss United States of America, LLC*,
52 F.4th 773 (9th Cir. 2022) ............................................................................... 21

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ....................................................................................... 6, 21, 22

*Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission*,
565 U.S. 171 (2012) ........................................................................................... 24

*Hurley. v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995) ........................................................................................... 24

*Illinois Bible Colleges Association v. Anderson*,
870 F.3d 631 (7th Cir. 2017) ............................................................................... 27

*Illinois Republican Party v. Pritzker*,
973 F.3d 760 (7th Cir. 2020) ................................................................................. 6

*Indiana Right to Life Victory Fund v. Morales*,
112 F.4th 466 (7th Cir. 2024) .......... 14

*Indiana Right to Life Victory Fund v. Morales*,
66 F.4th 625 (7th Cir. 2023) .......... 14, 15

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) .......... 6, 18, 39

*Lopez v. Hammett*,
2021 WL 4264363 (N.D. Ill. Sept. 20, 2021) .......... 19

*LSO, Ltd. v. Stroh*,
205 F.3d 1146 (9th Cir. 2000) .......... 6

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 5

*Maier v. United Parcel Service, Inc.*,
721 F. Supp. 3d 693 (N.D. Ill. 2024) .......... 13

*Majors v. Abell*,
317 F.3d 719 (7th Cir. 2003) .......... 14

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*
584 U.S. 617 (2018) .......... 27, 29

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) .......... 15

*Moranski v. General Motors Corp.*,
433 F.3d 537 (7th Cir. 2005) .......... 18

*Nance v. CRST Expedited, Inc.*,
2024 WL 4024765 (S.D. Ill. Sept. 3, 2024) .......... 12

*National Institute of Family & Life Advocates v. Raoul*,
685 F. Supp. 3d 688 (N.D. Ill. 2023) .......... 7, 9, 15

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .......... 24, 29, 30, 32

*Our Lady's Inn v. City of St. Louis,*
349 F. Supp. 3d 805 (E.D. Mo. 2018) .......... 17, 20

*Pacific Gas and Electric Company v. Public Utilities Commission of California,*
475 U.S. 1 (1986) ........ 22

*Platt v. Board of Commissionrs on Grievances & Discipline of Ohio Supreme Court*,
769 F.3d 447 (6th Cir. 2014) ........ 16

*Plyler v. Doe*,
457 U.S. 202 (1982) ........ 38

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ........ 33, 34

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........ 34

*Seattle's Union Gospel Mission v. Woods*,
142 S. Ct. 1094 (2022) ........ 32

*Serbian Eastern Orthodox Diocese for United States of America & Canada v. Milivojevich*,
426 U.S. 696 (1976) ........ 32

*Silha v. ACT, Inc.*,
807 F.3d 169 (7th Cir. 2015) ........ 5, 18

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) ........ 17, 20, 21, 40

*Smith v. City of Chicago*,
3 F.4th 332 (7th Cir. 2021). ........ 38

*Speech First, Inc. v. Killeen*,
968 F.3d 628 (7th Cir. 2020) ........ 7, 9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........ passim

*Tagami v. City of Chicago*,
875 F.3d 375 (7th Cir. 2017) ........ 36

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) ........ 6

*Tandon v. Newsom*,
593 U.S. 61 (2021) .................................................................................... 25

*The Bail Project, Inc. v. Commissioner of the Indiana Department of Insurance*,
76 F.4th 569 (7th Cir. 2023) ........................................................................ 36

*United States v. Indianapolis Baptist Temple*,
224 F.3d 627 (7th Cir. 2000) ....................................................................... 27

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ................................................................................... 38

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ................................................................................... 22

*Watson v. Jones*,
80 U.S. (13 Wall.) 679 (1871) ...................................................................... 32

*Wisconsin Right to Life State Political Action Committee v. Barland*,
664 F.3d 139 (7th Cir. 2011) ....................................................................... 18

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
471 U.S. 626 (1985) ................................................................................... 37

**Statutes**

775 ILL. COMP. STAT. ANN. § 5/2-101(A)(2) ............................................... 24, 26

775 ILL. COMP. STAT. ANN. § 5/2-101(B)(2) ..................................................... 27

775 ILL. COMP. STAT. ANN. § 5/2-101(E-1) ............................................ 25, 26, 34

775 ILL. COMP. STAT. ANN. § 5/2-101(F) ........................................................ 27

775 ILL. COMP. STAT. ANN. § 5/2-102(A) ................................... 8, 14, 30, 31, 34

775 ILL. COMP. STAT. ANN. § 5/2-102(J) ......................................................... 31

775 ILL. COMP. STAT. ANN. § 5/2-102(K) .......................................... 10, 11, 37

775 ILL. COMP. STAT. ANN. § 5/2-104 ................................................. 25, 26, 27

775 ILL. COMP. STAT. ANN. § 5/3-106 ................................................. 25, 26, 27

775 ILL. COMP. STAT. ANN. § 5/4-104 ........................................................ 25, 27

775 ILL. COMP. STAT. ANN. § 5/5-102.1(b) ........................................ 25, 26, 27

775 ILL. Comp. STAT. ANN. § 5/5-103 ........................................ 26

**Other Authorities**

Athanasius G. Sirilla, *The "Nonministerial" Exception*, 99 Notre Dame L. Rev. 393 (2023) ........................................ 33

Illinois Department of Human Rights, *Employer Notice* ........................................ 10, 37

Office of the Governor, *Gov. Pritzker Signs Landmark Legislation Further Expanding Reproductive Rights in Illinois* ........................................ 29

## INTRODUCTION

Defendants failed to provide the Court with any basis to dismiss this action or to deny injunctive relief. The 60-page Verified Complaint meticulously alleges both actual and imminent injuries that secure Plaintiffs' standing. And intervening developments just confirm that Plaintiffs suffer active and imminent injuries as they actively interview and fill new vacancies, directly asking applicants about their personal experiences with abortion (and acting on what they learn). The Verified Complaint also alleges detailed facts that state a claim for each cause of action. Simply put, Plaintiffs easily allege what is necessary to stay in court.

Plaintiffs also made the showings necessary for a preliminary injunction. Defendants concede that the Act forces churches and religious organizations to hire those who act contrary to their religious beliefs on the sanctity of life. They also concede that the Act forbids religious speech on the topic that some find offensive. The Act triggers strict scrutiny many times over, and Defendants barely even try to carry their burden to show that it satisfies "the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). In a conclusory one-sentence footnote, Defendants say that the Act satisfies strict scrutiny because it supposedly "reflect[s] the State's compelling interest in preventing invidious discrimination in employment." Defs.' Br. 22 n.5. But this ignores that the State must have a compelling interest in denying an exemption for *Plaintiffs in particular*, that courts have declined to find the State's asserted interest compelling, that Plaintiffs' conduct is not invidious, and that the Act is not narrowly tailored. With no real defense on strict scrutiny, the Court's analysis is streamlined, and an injunction should enter.

## INTERVENING FACTUAL DEVELOPMENTS

There have been several important factual developments since Plaintiffs filed their Verified Complaint and Motion for Preliminary Injunction. *See* Supplemental Declaration of Nicole Tibbetts, attached as Exhibit 1; Supplemental Declaration of Monsignor David J. Hoefler, attached as Exhibit 2.[1] To explain these developments and to clarify Plaintiffs' allegations that they only recruit, hire, and retain those who comply with their conduct policies, *see* Verified Complaint ("VC"), ECF No. 1, ¶¶ 128–33, PCC of Rockford explains that every applicant for employment must complete and submit its Employee Application, which directly elicits information to determine whether the applicant has had or facilitated an abortion by asking "Have you had any personal experiences related to abortion? If so, please explain." Supp. Tibbetts Decl. ¶ 7–8. All applicants also have an interview during which the applicant is asked the questions from a prepared Interview Form. *Id.* ¶ 9. The Interview Form directly elicits information to determine whether the applicant has had or facilitated an abortion. *Id.* ¶ 10. The Interview Form also explains the differential treatment that PCC of Rockford requires for individuals who had or facilitated an abortion in the form of mandatory counseling and post-abortion healing programs. *Id.* ¶ 11.

When Plaintiffs filed their Verified Complaint on March 20, 2025, PCC of Rockford sought to fill two open positions: a Receptionist and a Staff Nurse. VC ¶ 57. Since then, PCC of Rockford has filled its Receptionist position and now needs to fill two additional positions: (1) a second Staff Nurse, and (2) a Development Director. Supp. Tibbetts Decl., at ¶ 4.

---

[1] Plaintiffs offer these supplemental facts for the Court's benefit in evaluating their motion for preliminary injunction. These supplemental facts just underscore and reinforce existing allegations in the Verified Complaint. If the Court believes any of these facts are necessary for its determination, Plaintiffs can easily amend the Verified Complaint to include them.

PCC of Rockford received 12 applications for its Receptionist position and filled the vacancy with one of those external applicants. *Id.* ¶¶ 12–13. During the interviews for this position, PCC of Rockford directly asked applicants whether they have had or facilitated an abortion. *Id.* ¶ 14. The successful candidate confirmed that she has not had or facilitated an abortion. *Id.* One prospective applicant expressed her intention to apply but declined to move forward upon learning of (and expressing disagreement with) PCC of Rockford's pro-life religious mission and conduct requirements. *Id.* ¶ 15.

PCC of Rockford now seeks to fill a second Staff Nurse in addition to the Staff Nurse position described in the Verified Complaint. *Id.* ¶ 16. This second vacancy was created because PCC of Rockford recently promoted an existing Staff Nurse to the Director of Nursing. *Id.* ¶ 17. On June 16, 2025, PCC of Rockford received Employment Application forms from two applicants for the open Staff Nurse positions. *Id.* ¶ 18. As explained above, the application forms asked both applicants whether they have any personal experience with abortion, and PCC of Rockford will ask that question again (and act on what it learns) during their interviews. *Id.*

PCC of Rockford is also actively recruiting a new Development Director. On or around June 10, 2025, PCC of Rockford's current Development Director advised that she will resign upon the birth of her child this fall. *Id.* ¶ 22. PCC of Rockford is immediately beginning its efforts to recruit applicants to fill the Development Director position, with a successful applicant beginning in January 2026. *Id.* ¶ 23. The Development Director has a central role in communicating and modeling PCC of Rockford's pro-life religious beliefs, in both word and deed. *Id.* ¶ 24. The Development Director must engage in both internal and external pro-life communications and has the responsibility to plan, implement, and coordinate all

aspects of fundraising, including direct mail, special events, donor relationships, data processing, and public relations. *Id.* ¶ 25. The Development Director must be an individual who "[e]xhibits a strong pro-life commitment and upholds a lifestyle of sexual purity," "[w]illingly upholds the Statement of Principle, Statement of Faith, and policies of The Pregnancy Care Center of Rockford," and "[d]emonstrates excellent written and verbal communication skills, including public speaking and media engagement." *Id.* ¶ 26. The Development Director represents PCC of Rockford in the community and oversees public relations, direct mail, events, donor development, community presentations, and marketing. *Id.* ¶ 27–28.

When Plaintiffs filed the Verified Complaint, the Diocese of Springfield had two open positions: Respect Life Advocate and Associate General Counsel. VC ¶ 92. Since then, the Diocese has received applications and conducted multiple interviews for the Respect Life Advocate position, which asked applicants questions designed to uncover conduct that does not comply with the Diocese's faith-based policies (including objectionable reproductive decisions). Supp. Hoefler Decl. ¶ 5–6. Also since filing the Verified Complaint, the Diocese has received applications and conducted interviews for the Associate General Counsel position, asking the same probing questions. *Id.* ¶¶ 7–8. The Diocese has extended an offer for the Associate General Counsel position, and upon acceptance, the applicant will be subject to all of the Diocese's employment and conduct policies, including policies that prohibit objectionable reproductive decisions. *Id.* ¶ 9.

Beyond these positions described in the Verified Complaint, the Diocese has begun actively recruiting to fill six additional positions: (1) General Counsel; (2) Maintenance and Groundskeeper; (3) Database and Parish Service Administrator; (4) Executive Secretary; (5) Administrative Assistant; and (6) Internal Auditor. *Id.* ¶

10. The Diocese is actively soliciting applications for each of these positions and will schedule interviews that will ask the applicants questions designed to uncover conduct that does not comply with the Diocese's faith-based policies, including objectionable reproductive decisions. *Id.* ¶ 11. The Diocese's General Counsel serves one of the most important civil functions in the Diocese of Springfield and is entrusted with understanding, accepting, communicating, complying with, and faithfully representing the Diocese's religious beliefs to a wide array of internal and external audiences. *Id.* ¶ 12. The remaining five new positions are expected to understand and comply with the Diocese's religious beliefs, but they do not carry the same responsibility for communicating beliefs to external audiences. *Id.* ¶ 13.

Plaintiffs' ongoing recruitment and interviewing activities plainly violate the Act's new requirements concerning reproductive decisions.

## **<u>LEGAL STANDARD</u>**

A motion to dismiss under Rule 12(b)(1) is governed by a "flexible" standard, under which plaintiffs need only "plausibly suggest" the standing elements and courts "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id*. at 173–74 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). A case should be dismissed for lack of jurisdiction "only if it is impossible for the plaintiff to prevail on the facts alleged." *Id*. at 174. The standard is even more lenient in First Amendment cases, where "standing and ripeness requirements are more relaxed." *Covenant Media of Illinois, L.L.C. v. City of Des Plaines, Ill.*, 391 F. Supp. 2d 682, 689 (N.D. Ill. 2005) (citation omitted). Indeed, "when the threatened enforcement effort implicates First

Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

Under Rule 12(b)(6), a complaint survives dismissal so long as it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff need only provide "a short and plain statement of the claim," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009), sufficient to "give the defendant fair notice" of the claim and the grounds upon which it rests. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Courts must construe all allegations and inferences in the plaintiff's favor and may dismiss only where "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Tamayo*, 526 F.3d at 1081. At this stage, plaintiffs need not "anticipate defenses" or prove their case in detail; they must merely "nudge their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Defendants overstate the standard for preliminary injunctions in First Amendment cases, Defs.' Br. 34–36, where the analysis "begins and ends with the likelihood of success on the merits." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). At this preliminary stage, Plaintiffs "need not show that [they] definitely will win the case," and they need not even show a likelihood of success "by a preponderance" because "that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Rather, Plaintiffs satisfy this standard by offering "a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* Plaintiffs easily satisfy that standard.

## ARGUMENT

### I. Plaintiffs have standing.

To establish standing, Plaintiffs must allege (1) an actual or imminent injury, (2) caused by Defendants, and (3) redressable by a court decision. *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 573 U.S. 149, 157–58 (2014). Defendants only questioned the first element, but they failed to cite and apply the applicable test. *See* Defs.' Br. at 5–13.

Actual "arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law." *SBA List*, 573 U.S. at 158–59. Instead, Plaintiffs establish an actual or imminent injury before enforcement by making "one of two showings." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). *First*, a plaintiff can establish an actual injury by alleging "a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* at 638 (citation omitted). *Second*, a plaintiff can establish an imminent injury by alleging that it intends to engage in conduct that at least arguably violates the law, giving rise to a credible threat of prosecution. *Id.*; *SBA List*, 442 U.S. at 289. Either showing is "sufficient to establish an injury in fact." *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 698 (N.D. Ill. 2023). The Verified Complaint carefully alleges facts that satisfy both.

#### A. Plaintiffs allege completed and ongoing chilled-speech injuries.

The Court should deny Defendants' motion to dismiss because it overlooks Plaintiffs' allegations of *completed* speech injuries. *See id.* Plaintiffs allege that they have chilled their speech because of the Act. VC ¶ 134, 139–40, 190, 203. Plaintiffs have written statements clarifying that they cannot hire employees who make objectionable reproductive decisions, and they want to publish these statements on career websites and job postings. *Id.* But Plaintiffs refrain from doing so—chilling

and self-censoring their speech—because they "reasonably fear[] that the statement will invite investigations and complaints under the Act." *Id.* ¶ 140. Adding insult to constitutional injury, the Act's chilling effect impairs Plaintiffs' ability to advertise and fill positions with people who will abide by their beliefs. *Id.* ¶ 203; Supp. Decl. of Nicole Tibbetts, attached as Exhibit 1, at ¶¶ 9–11 (PCC of Rockford wishes to engage a staffing company to help it fill nursing positions, but has not done so because of the Act).

As explained more fully in Section I.B.2 below, Plaintiffs' self-censorship is objectively reasonable under these circumstances.

- The Act and Defendants' Guidance expressly prohibit Plaintiffs' intended speech. 775 ILL. COMP. STAT. ANN. § 5/2-102(A) (prohibiting refusal to recruit, select, or hire based on reproductive decisions); ILL. ATT'Y GEN. & ILL. DEP'T OF HUM. RTS., *Non-Regulatory Guidance*, ECF No. 1-12 at 2–6 (March 2023) (interpreting the Act to prohibit employers from refusing to recruit or hire an employee for "terminating an unplanned pregnancy").
- Defendants refused to disavow enforcement. VC ¶¶ 173–88.
- Defendants have directly communicated their intention to enforce the Act against the Diocese and other religious organizations. VC ¶¶ 184–88.
- Defendants made public statements expressing their support and zeal for enforcing the Act's new provisions. *Id.* ¶¶ 122–24.
- Defendants solicit complaints from the public at large, *id.* ¶¶ 29, 109, and Plaintiffs' intended statements would be widely published to the public on career websites, VC ¶ 134, 139.
- Defendants vigorously enforce the Act, receiving over 10,000 complaints and inquiries every year. *Id.* ¶¶ 110–112.

This Court has found standing for less. In *NIFLA v. Raoul*, a pro-life group alleged that an Illinois law chilled its speech by prohibiting so-called "deceptive" statements by pregnancy centers that don't offer abortion. 685 F. Supp. 3d at 698–99. The Attorney General trotted out many of the same standing arguments raised here in an unsuccessful attempt to justify chilling pro-life speech. *See id.* This Court rejected the Attorney General's arguments, holding that a "chilling effect on [] speech" was "sufficient to establish an injury in fact." *Id.* Noting that the Attorney General made public statements supporting the law—as both Defendants did here—this Court held that "[a] more unambiguous chilling and self-censorship of protected speech there cannot be," and "[o]nly fools would not have their First Amendment rights chilled under these circumstances." *Id.* at 699.

Plaintiffs easily satisfy the first showing under *SpeechFirst*, and their chilled speech is independently sufficient to establish standing.

### B. Plaintiffs allege a credible threat of imminent injuries.

Plaintiffs also satisfy the second showing under *SpeechFirst* because they allege (1) an intention to engage in conduct affected by a constitutional interest and at least arguably proscribed by the Act; and (2) they face a credible threat of enforcement. *Speech First*, 968 F.3d at 638 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

#### 1. Plaintiffs' religious conduct arguably violates many provisions of the Act.

Defendants do not dispute that Plaintiffs' religious speech and conduct implicate constitutional interests. Instead, Defendants argue that "Plaintiffs did not allege that they fail to comply with the Act," and that conflict between Plaintiffs and the law is "highly unlikely." Defs.' Br. 7, 10. That's wrong twice over. *First*, Plaintiffs need only allege that their intended conduct is "arguably proscribed" by

the Act. *See Brown v. Kemp*, 86 F.4th 745, 764 (7th Cir. 2023). *Second*, the Verified Complaint fills page after page with detailed allegations describing how "Plaintiffs violate the Act's Employment Clause," VC ¶¶ 126–40, "Plaintiffs violate the Act's Offensive Speech Clause," *id.* ¶¶ 141–55, "Plaintiffs violate the Act's Accommodation Clause," *id.* ¶¶ 156–60, "Plaintiffs' violate the Act's Benefit Clause," *id.* ¶¶ 161–64, and "Plaintiffs violate the Act's Notice Clause," *id.* ¶¶ 165–71.

Far from hypothetical speculation, Plaintiffs allege that they *already* violate the Act in several ways. Plaintiffs already threaten employees with termination if they make objectionable reproductive decisions, VC ¶¶ 130–31, 136–37, which Defendants' own guidance describes as an independent violation of the Act, VC ¶ 127. Plaintiffs have subjected employees to differential treatment based on whether they have had an abortion. VC ¶ 132; Hoefler Decl. ¶ 39; Supp. Tibbetts Decl. ¶¶ 5, 11. Plaintiffs already refuse to recruit or hire employees who make objectionable reproductive decisions. VC ¶¶ 128, 133, 135, 138. Plaintiffs condition employment upon agreeing not to obtain or facilitate an abortion. VC ¶¶ 129. Plaintiffs do not provide equal benefits for people making reproductive decisions that they oppose. VC ¶¶ 161–64. And Plaintiffs regularly engage in pro-life speech that many view as unwelcome or offensive. VC ¶ 141–55. All these actions actively violate the Act's Employment, Accommodation, Benefit, or Offensive Speech Clauses.

Plaintiffs also allege that they *already* violate the Act's Notice Clause, which requires employers to post a State-prepared or -approved notice in their workplaces and employee handbooks "summarizing the requirements of this Article," 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1). The State-approved notice says that employers "may not treat people differently based on . . . any [] protected class named in the Act." ILL. DEP'T OF HUM. RTS., *Employer Notice*, https://perma.cc/PK9A-SVUB.

Defendants say that the New Bill didn't change the Notice Clause so they "assum[e]" that Plaintiffs' existing nondiscrimination statements "likely" comply with the Act. Defs.' Br. 10–11. They are wrong on both counts. The New Bill *did* change "the requirements of this Article," § 5/2-102(K)(1), by adding a new protected class named in the Act. Plaintiffs violate the Notice Clause because they do not use a State-prepared or -approved notice, and in any event, Plaintiffs do not—and will not—post notices that extend to the Act's requirements about reproductive decisions. *See* VC ¶¶ 169–71.

Plaintiffs allege even more imminent violations that will expose them to complaints, fines, and penalties. Plaintiffs seek to fill numerous open positions with responsibility for carrying out their pro-life missions, and they have received applications and conducted interviews applying their faith-based policies. VC ¶¶ 53–69; 88–103; Supp. Tibbetts Decl.¶¶ 4–11 (noting that the PCC filled its Receptionist position after receiving 12 applications, has received multiple applications for two open Staff Nurse positions, and is now recruiting for a Development Director position); Supp. Hoefler Decl. ¶¶ 4, 10–13 (noting that the Diocese has received applications and conducted interviews for its Respect Life Advocate and Associate General Counsel positions, and is now recruiting to fill six additional positions). Their applications and interview processes are designed to uncover non-compliant reproductive conduct. *See* VC ¶ 138, Supp. Tibbetts Decl. ¶¶ 12–18 (application and interview questions ask about personal abortion experience); Supp. Hoefler Decl. ¶¶ 2, 6, 8, 11 (final interview "to ensure that all employees abide by Catholic teaching, including Catholic doctrine on reproduction"). And Plaintiffs evaluate and select applicants using policies that require adverse action for *every* person who had or facilitated an abortion: refusal to hire for most, or

differential treatment by requiring post-abortion programs for others whose repentance of past mistakes makes them strong pro-life advocates. VC ¶¶ 128–32, 135–38; Supp. Tibbetts Decl. ¶ 12–18; Hoefler Decl. ¶ 39. Plaintiffs require all applicants to commit to avoiding objectionable reproductive decisions. VC ¶ 129. Beyond the past violations described above, these other violations are impending as Plaintiffs receive dozens of applications and fill their open positions. Supp. Tibbetts Decl. ¶¶ 6–7; Supp. Hoefler Decl. ¶¶ 5, 7, 11.

Ignoring the many violations above, Defendants assert three arguments from the nonbinding and distinguishable *Evergreen* cases. Defs.' Br. 7 (citing *Evergreen Ass'n, Inc. v. Hochul*, 2025 WL 359074, at *4 (N.D.N.Y. Jan. 31, 2025); *Evergreen Ass'n, Inc. v. City of New York*, 2025 WL 416903, at *1 (E.D.N.Y. Feb. 6, 2025)). These arguments are no surprise to Plaintiffs, and the Verified Complaint avoids each of the cited standing deficiencies.

*First*, Defendants assume that Plaintiffs' *existing* employees "likely" agree with Plaintiffs' religious beliefs and are thus "unlikely" to make an objectionable reproductive decision. Defs.' Br. 7–8. For one thing, Plaintiffs *have* taken adverse action against existing employees for violating pro-life beliefs and conduct policies in matters of human sexuality. *See* Tibbetts Decl. ¶ 18; Hoefler Decl. ¶ 16. And the Act "does not exclusively cover employees. It also covers prospective employees and even unpaid interns, among other classes of workers." *Nance v. CRST Expedited, Inc.*, 2024 WL 4024765, at *4 (S.D. Ill. Sept. 3, 2024). Plaintiffs allege that they need to fill open positions, that they receive multiple applications for each opening, and that they often receive applications from prospective employees who are *not* aligned with Plaintiffs' pro-life missions but simply seek employment. VC ¶¶ 53–56, 88–92; Supp. Tibbetts Decl. ¶¶ 6–7 (PCC of Rockford received 12 applications for its

Receptionist position and at least one prospective applicant disagreed with its pro-life mission). These allegations—which the Court must credit over Defendants' assumptions—show that Plaintiffs actively and imminently apply pro-life policies that violate the Act.

*Second*, Defendants assume that Plaintiffs are "unlikely" to learn of anyone's objectionable reproductive decisions in the first place. Defs.' Br. 8–9. This argument also overlooks Plaintiffs' allegations. *See* VC ¶¶ 128–32. PCC of Rockford requires every applicant to disclose whether they have "any personal experiences related to abortion," Supp. Tibbetts Decl. ¶¶ 12–17, and it takes adverse action based on what it learns, VC ¶ 128–29. The Diocese also uses interview questions designed to elicit information that can "distinguish applicants based on reproductive decisions." VC ¶ 138. The Diocese's Vicar General conducts the final interview for each position "to ensure that all employees abide by Catholic teaching, including Catholic doctrine on reproduction at issue in this matter." Hoefler Decl. ¶ 2. Indeed, Plaintiffs violate the Act by even asking questions that tend to identify and exclude people based on a protected characteristic. *See Maier v. United Parcel Serv., Inc.*, 721 F. Supp. 3d 693, 720 (N.D. Ill. 2024).

*Third*, Defendants say that Plaintiffs don't subject employees to adverse action based on their reproductive decisions, but only on their lack of repentance. Defs.' Br. 9. This is not true and misstates Plaintiffs' allegations. The Verified Complaint confirms that Plaintiffs subject *every* person to an adverse action for making an objectionable reproductive decision. Often the adverse action takes the form of a refusal to hire, discipline, or termination. VC ¶¶ 128–31, 135–38; Supp. Tibbetts Decl. ¶ 12. Other times, adverse action takes the form of differential treatment by imposing more requirements for people who have had or facilitated an

abortion. VC ¶ 132; Supp. Tibbetts Decl. ¶ 12; Hoefler Decl. ¶ 39; Plaintiffs take adverse action in every circumstance. *See* 775 ILL. COMP. STAT. ANN. 5/2-102(A) (prohibiting differential "terms, privileges or conditions of employment").

One final point. Defendants argue that Plaintiffs' ongoing facts on hiring show that their harm is speculative. Defs.' Br. 37 n.14. Exactly the opposite is true. The fact that Plaintiffs have *already* received applications that violate the Act, conducted interviews that violate the Act, subjected new hires to policies that violate the Act, and actively begun recruiting for over 9 new positions just proves that Plaintiffs imminently and repeatedly violate the Act. Plaintiffs satisfy the *SpeechFirst* test by alleging an intention to engage in conduct that at least arguably violates the Act.

**2. Plaintiffs face a credible threat of enforcement.**

Defendants do not materially dispute their credible threat of enforcement, and for good reason. Plaintiffs face a credible threat for at least six reasons.

*First*, in First Amendment cases, the Seventh Circuit recognizes that "the threat is latent in the existence of the statute" so long as the law "arguably covers" the plaintiffs' conduct. *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003). The Seventh Circuit has "zero difficulty" concluding that plaintiffs have standing when a challenged law "poses a threat of enforcement latent in the statute's existence and traceable to its enforcement." *Indiana Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024). As explained in the Verified Complaint and the section above, a credible threat exists because the Act prohibits Plaintiffs' conduct and Defendants' own guidance confirms that fact.

*Second*, "the absence of a clear disavowal tends to support finding a credible threat of prosecution." *Brown*, 86 F.4th at 769; *see Indiana Right to Life Victory*

*Fund v. Morales*, 66 F.4th 625, 631 (7th Cir. 2023); *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023); *SBA List*, 573 U.S. at 165. Indeed, when plaintiffs challenge "a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to disavow enforcement' is sufficient to establish a credible threat of prosecution in pre-enforcement challenges on First Amendment grounds." *Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024) (citation omitted). Defendants had every opportunity to disavow enforcement but refused.

*Third*, "State officials' affirmative expressions of intent to enforce a statute may certainly give rise to a credible threat." *Indiana Right to Life*, 66 F.4th at 631; *Brown*, 86 F.4th at 767–78. Far from disavowing enforcement, the Department of Human Rights rejected the Diocese's requests for accommodations and directly communicated its intention to enforce the Act's new provisions against the Diocese. VC ¶¶ 184–88. At a minimum, this counts as a "general warning of enforcement" of a "new law," which is "sufficient to establish a credible threat of prosecution." *Matsumoto*, 122 F.4th at 797.

*Fourth*, this Court finds a credible threat of enforcement when officials make public statements supporting the law or expressing zeal for enforcement. *NIFLA v. Raoul*, 685 F. Supp. 3d at 698–99. Both Defendants made such public statements here. VC ¶¶ 122–24. Defendant Raoul cheered the New Bill and "committed to using the authority of [his] office" to ensure that Illinois is an "oasis" and "safe haven," especially for "abortion and gender-affirming care." VC ¶ 123. Defendant Bennett similarly praised the New Bill by lamenting the Supreme Court's decision overruling *Roe v. Wade* and stating that it will work "diligently" to "strengthen protections for reproductive rights." VC ¶ 124.

*Fifth*, a credible threat of enforcement is "bolstered" when "the universe of potential complainants is not restricted to state officials" and the law allows "any person" to file a complaint. *SBA List*, 573 U.S. at 164; *see Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (finding broad ability to file complaints "bolsters the credibility of enforcement"). This threat of enforcement is especially clear here because "any member of the public can file a complaint" and Plaintiffs' intended speech would be "broadcast[] to the public" through online career websites and job postings. *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 852 (6th Cir. 2024).

*Sixth*, the Supreme Court has found that a credible threat exists when enforcement is "not a rare occurrence" and an enforcing agency "handles about 20 to 80" complaints per year. *SBA List*, 573 U.S. at 164–65. Defendants boast that they receive over 10,000 complaints and inquiries every year, mostly in the employment context. VC ¶¶ 110–112.

Thus, Plaintiffs have standing under both prongs of the *SpeechFirst* test, and the Court should deny Defendants' motion to dismiss.

### 3. The Act undermines Plaintiffs' religious missions.

Finally, Defendants say Plaintiffs suffer no injury because the reproductive decisions of its members do not affect their missions, diminishing Plaintiffs' concern that such decisions reflect upon them. Defs.' Br. 11–12. But this ignores both the law and the facts.

To begin, it is the religious organization—not the State—who decides what conduct impairs its mission. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000). And the Seventh Circuit already rejected Defendants' argument in *Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006). There, a religious group prohibited

members from making personal decisions to engage in sexual conduct outside of a traditional marriage. *Id.* at 863. The Seventh Circuit had "no difficulty" finding that including members who violate its conduct policy undermines the group's mission, especially when beliefs about reproduction are "among its defining values." *Id.* Even personal decisions violating reproductive conduct policies undermine a religious group's expressive mission, hinder its ability to organize staff, and "cause the group as it currently identifies itself to cease to exist." *Id.*; *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 821–22 (E.D. Mo. 2018).

Plaintiffs plausibly allege that objectionable reproductive decisions undermine their very missions. VC ¶¶ 66–69, 84–87. Plaintiffs say their policies on reproduction are necessary "to maintain the core values of our faith-based organization and operate as the hands and feet of Jesus Christ." PCC of Rockford Employee Handbook, ECF No. 1-3 at 6; *see* Hoefler Decl. ¶ 15. Plaintiffs explain that employees' objectionable reproductive decisions destroy Plaintiffs' ability to credibly counsel others to avoid that decision and undermine their reputation as ministries sincerely committed to their beliefs. VC ¶¶ 66–69, 84–87. Courts must "give deference" to these allegations, *Dale*, 530 U.S. at 653, and courts have accepted similar allegations as undermining a pro-life mission. *Walker*, 453 F.3d at 863; *Our Lady's Inn*, 349 F. Supp. 3d at 821–22; *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023).

**C. Plaintiffs' claims are ripe.**

Defendants say Plaintiffs' claims are "prudentially unripe," but they misstate the legal standard. Defs.' Br. 13–14. As a threshold matter, the Supreme Court has challenged the continued viability of the prudential ripeness doctrine based on the Court's affirmation that federal courts have a "virtually unflagging" obligation to

hear and decide cases before them. *SBA List*, 573 U.S. at 167. In the Seventh Circuit, prudential ripeness considers "whether the relevant issues are sufficiently focused and developed to permit judicial review." *Wis. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). When a pre-enforcement challenge alleges a credible threat of enforcement implicating constitutional rights, courts routinely find the claims ripe for review. *SBA List*, 573 U.S. at 159; *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012).

Plaintiffs easily satisfy that standard for the reasons explained in Sections I.A. and I.B., above. Plaintiffs' claims raise purely legal questions about the constitutionality of statutory provisions and official enforcement policies. The relevant facts are well-developed, "compliance with the mandate is imminent," and "the injury to the plaintiffs is already underway." *Korte*, 735 F.3d at 667–68. Courts also disfavor dismissing First Amendment claims for lack of ripeness when the plaintiff must either chill protected speech or risk sanctions. *ACLU of Ill.*, 679 F.3d at 590–91. Because Plaintiffs allege that the Act forces them to either violate their faith or face consequences, this case requires judicial review now.

**D. Jurisdictional discovery is unnecessary and improper.**

The Court should deny Defendants' request for jurisdictional discovery for two reasons. *First*, Defendants only mount a facial attack challenging the adequacy of Plaintiffs' undisputed jurisdictional allegations; they do not mount a factual attack by presenting evidence contesting the truth of Plaintiffs' allegations. Defs.' Br. 14–15; *see Silha*, 807 F.3d at 173 (distinguishing facial and factual attacks). A facial challenge to jurisdiction "accepts the plaintiff's factual allegations and challenges their legal sufficiency," and "[t]his type of challenge does not require jurisdictional discovery." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir.

2005). Jurisdictional discovery "is not warranted absent a factual dispute about subject matter jurisdiction." *Lopez v. Hammett*, 2021 WL 4264363, at *5 (N.D. Ill. Sept. 20, 2021); *Fincantieri U.S.A. Inc. v. Noonan*, 2020 WL 607572, at 5 (E.D. Wis. Feb. 7, 2020) ("a defendant must make a factual attack . . . not merely speculate"). Because Defendants did not present evidence to mount a factual attack, jurisdictional discovery is improper.

*Second*, Discovery into Plaintiffs' sincerity or enforcement risk is improper and irrelevant. *See Walker*, 453 F.3d at 859. Plaintiffs' 60-page Verified Complaint, its 15 exhibits, and declarations provide more than enough evidence of Plaintiffs' faith-based missions, conduct policies, open positions, chilled speech, and conflicts between religious operations and the Act. The Verified Complaint also documents Defendants' support for the New Bill, vigorous enforcement of the Act, solicitation of complaints from the public, and communications confirming that they will apply the New Bill to Plaintiffs. The Court should deny Defendants' request.

## II. Plaintiffs state a claim—and are likely to succeed—on each of their causes of action.

### A. The Act violates Plaintiffs' right to expressive association.

The First Amendment protects the right "to associate with others" in pursuit of religious and educational ends. *Dale*, 530 U.S. at 647 (quotation omitted). Plaintiffs exercise that right; they engage in expressive association by joining with both employees and volunteers "to advocate" religious and pro-life "viewpoints." *Id.* at 648; *see* Pls.' Memo 11–15. But the Act would significantly impair this expression by forcing Plaintiffs to employ those who cannot credibly convey their message. Plaintiffs plausibly allege—and will likely succeed in showing—that the Act violates their right to expressive association. Pls.' Memo 13–15. Indeed, Defendants failed to

meaningfully engage *several* cases that compel this conclusion. *See Walker*, 453 F.3d at 862–63; *Slattery*, 61 F.4th at 287–88; *Our Lady's Inn*, 349 F. Supp. 3d at 820–22.

The State does not dispute that Plaintiffs are expressive associations or that the Act would require them to speak through individuals who contradict their message. It argues instead that the right to expressive association does not apply in the employment context and that, even if it did, forcing Plaintiffs to hire those who contradict their beliefs will not affect their religious message. Defs.' Br. 16–20. Both arguments are wrong. The Act triggers and fails strict scrutiny. Pls.' Memo. 23–25.

#### 1. Like other First Amendment rights, expressive association applies in the employment context.

According to the State, *no one* has a right to expressive association in the employment context. Defs.' Br. 16–18. But that is not, and cannot be, the law. By the State's logic, the Boy Scouts in *Dale* could prevent someone who opposed their values from being a volunteer scoutmaster but would still be forced to hire that same person for the top leadership position within the organization.

That makes no sense. "[C]ompelled hiring, like compelled membership, may be a way in which a government mandate can affect in a significant way a group's ability to advocate public or private viewpoints." *Slattery*, 61 F.4th at 288. And speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *303 Creative*, 600 U.S. at 594. So courts recognize the right to expressive association applies in the employment context. *E.g.*, *Slattery*, 61 F.4th at 286–91 (right applies to employers challenging law prohibiting discrimination on reproductive decisions); *Our Lady's Inn*, 349 F. Supp. 3d 820–22 (same); *CompassCare v. Hochul*, 125 F.4th 49, 60–61 (2d Cir. 2025) (same); *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1184–85 (D. Colo. 2023) (right applies to employers requiring shared belief and conduct); *Green*

*v. Miss United States of Am., LLC*, 52 F.4th 773, 803–05 (9th Cir. 2022) (VanDyke, Concurring) (expressive associations do not forfeit their rights even when they engage in "purely commercial activity").

Take *Slattery*. There, New York passed a law that prohibited employment discrimination based on a person's "reproductive health decision making." 61 F.4th at 283. Like Plaintiffs here, a pro-life pregnancy center claimed the law violated its freedom of expressive association "by preventing it from disassociating itself from employees who, among other things, seek abortions," which would "undermine[ ] its antiabortion message." *Id*. The Second Circuit agreed, explaining the center's "right to expressive association allows [it] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Id*. at 288. Because the law "force[d]" the center to employ "individuals who act or have acted against the very mission of its organization," it violated the center's rights. *Id*.

The Second Circuit again reached this result in *CompassCare*. In that case, a pregnancy care center and other groups claimed the same New York law violated their freedom of expressive association. 125 F.4th at 57. Like Illinois here, New York argued that "employers have *no* freedom of expressive association." *Id*. at 59. But the Second Circuit rejected that argument, holding that a "mission-based organization that advocates for a particular cause or set of beliefs" may show that "the compelled retention of a specific employee would impair its ability to express its message." *Id*. at 61.

The State glosses over these cases and insists that *Hishon*, 467 U.S. 69, "summarily rejected" expressive-association claims in the employment context. Defs.' Br. 16. But *Hishon* did no such thing. That case did not hold that employment decisions are categorically exempt from expressive-association protection; it *applied*

the expressive-association standards to a for-profit law firm and simply found that it had failed to make the required showing that extending partnership to a woman would "inhibit[ ]" expression of its "ideas and beliefs." *Hishon*, 467 U.S. at 78. Indeed, this typical expressive-association analysis would have been unnecessary if the Supreme Court held that employment decisions were categorically unprotected.

Nor is the State's position justified by any "difference between employees and members of a voluntary membership organization." Defs.' Br. 17. True, employees are "paid" to work while volunteers are not. *Id.* But speech "does not lose its First Amendment protection because money is spent to project it." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976); *accord Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (collecting cases where the Supreme Court affirmed that First Amendment protections extend to commercial associations).

And while there may be a "history" of some "government regulation" in the employment context, Defs.' Br. 18, that does not mean the government can regulate in ways that violate the First Amendment. For example, the government may "prohibit discrimination" in places of public accommodation. *303 Creative*, 600 U.S. at 591. "And there are no doubt innumerable goods and services that no one could argue implicate the First Amendment." *Id.* But "[a]t the same time, . . . no public accommodations law is immune from the demands of the Constitution." *Id.* Such laws cannot be "deployed to compel speech." *Id.* at 592. So too with employment laws. Government officials cannot misuse them to compel expressive association just because the State can generally regulate the subject matter. When employment "law and the Constitution collide," the Constitution "must prevail." *Id.*

**2. The Act burdens Plaintiffs' expression.**

Next, the State says the "Complaint contains no allegations from which the Court could infer" that the law "would have a significant impact on [Plaintiffs'] advocacy efforts or identity." Defs.' Br. 18–19. Not so.

Plaintiffs allege the Act "threatens and undermines [their] very mission" by forcing the ministries "to hire and retain employees who make reproductive decisions" that conflict with their pro-life beliefs and message. VC ¶ 202. Such individuals would not only be incapable of credibly communicating Plaintiffs' religious beliefs, but their "presence" alone would "force" the ministries "to send a message, both to [its clients] and the world, that [they] accept" abortion and other objectionable reproductive decisions "as a legitimate form of behavior." *Dale*, 530 U.S. at 653. Plaintiffs have rightly determined—and alleged—that employing such individuals without adverse action would "fatally undermine [their] pro-life mission" and hinder their efforts to "credibly and effectively" promote their religious message. VC ¶¶ 66–69; *accord id.* ¶¶ 84–85.

This determination is common sense. It also must be taken as true at the motion-to dismiss stage and given deference at all others. *See Dale*, 530 U.S. at 653 (courts must "give deference to an association's view of what would impair its expression"). And this is especially so when such evidence is provided in sworn pleadings, as here. VC ¶¶ 66–69, 84–87. In fact, courts do not "inquire further" when the record "contains written evidence of [the association's] viewpoint." *Id*. at 651. And such deference is proper when, as here, the association's determination as to what would impair its mission and message is ultimately a religious question. So while the State may think that hiring people who contradict Plaintiffs' beliefs will have "no impact" on Plaintiffs' religious "express[ion]," Defs.' Br. 20, that is not

something the State can competently (or constitutionally) decide. "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

Simply put, a religious organization "cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 201 (Alito, J., concurring). Because the Act would require Plaintiffs to accept employees who can neither affirm nor credibly convey the ministries' religious beliefs, it "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

### B. The Act violates the Free Exercise Clause.

Plaintiffs have stated a claim and are likely to succeed in showing that the Act triggers strict scrutiny under the Free Exercise Clause because it is not generally applicable or neutral.

#### 1. The Act is not generally applicable.

The Act is not generally applicable because the Act includes exemptions that "undermine[] the government's asserted interests," *Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021), yet Defendants refused to exempt Plaintiffs' religious exercise, VC ¶¶ 172–88. The Act categorically excludes certain secular employers from all the Act's requirements, 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(2),

provides for individualized exemptions for religious and secular reasons, *id.* § 5/2-104, *id.* § 5/3-106, *id.* § 5/4-104; *id.* § 5/5-102.1(b), gives Defendants discretion to determine what hiring qualifications are exempt as bona fide occupational qualifications ("BFOQs"), *id.* § 5/2-104(A), and what constitutes prohibited "harassment," *id.* § 5/2-101(E-1). Because the Act provides for such exemptions and Defendants refused to exempt Plaintiffs' "religious hardship," strict scrutiny applies. *Fulton*, 593 U.S. at 535; *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise").

Defendants assert that no "formal mechanism for individualized exemptions" exists under the Act because "[t]he exemptions that Plaintiffs cite are features of the statute to be interpreted and applied, not ad-hoc decisions committed to the regulator's judgment" and the Department does not adjudicate charges made under the Act. Defs.' Br. 28. Such arguments misunderstand the law and fail to rebut Plaintiffs' claim for at least two reasons.

*First*, categorical exemptions that are "features of the statute" destroy general applicability just as much as a system of discretionary individualized exemptions. "If anything, th[e] concern [that the government is deciding that secular motivations are more important than religious motivations] is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection." *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999).

In *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, the challenged city ordinances were not generally applicable because *the ordinances themselves* prohibited animal sacrifice to allegedly protect public health but also did not regulate hunters' disposal of their kills or restaurants' improper garbage disposal. 508 U.S. 520, 544 (1993). Such "underinclusive[ness]," *id.*, was part of the statute just as the Act itself fails to regulate certain employers (like elected public officials) and certain employers' conduct (like the speech of public accommodations). *See, e.g.*, 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(2), *id.* § 5/2-104; *id.* § 5/3-106; *id.* § 5/5-103; *id.* § 5/5-102.1(b). As in *Lukumi*, the Act's failure to similarly regulate certain employers and actions undermines the State's asserted interest in stopping discrimination based on reproductive decisions, showing that the Act "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534.

*Second*, Defendants do not deny or even acknowledge that the Act *does* give Defendants the discretion to assess on an individualized basis whether an employer's hiring qualification qualifies as an exempt BFOQ, 775 ILL. COMP. STAT. ANN. § 5/2-104(A), and whether an employer's speech is "harassment," *id.* § 5/2-101(E-1). Defendants must make such assessments because, as they admit, they have the power to "accept[s] or initiate[] charges" under the Act. Defs.' Br. 28. These exemption systems give Defendants discretion "to decide which reasons for not complying with the [Act] are worthy of solicitude" and destroy general

applicability, "regardless [of] whether any exceptions have been given." *Fulton*, 593 U.S. at 537.[2]

### 2. The Act is not neutral.

The Act also lacks neutrality because, in applying the Act, Defendants acted with "hostility" to religious beliefs and violated the Free Exercise Clause's bar on even "subtle departures from neutrality." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

*First*, the Department showed suspicion and hostility toward Plaintiffs' religious beliefs by refusing to extend the Act's statutory religious exemption to them. VC ¶¶ 172–88; Hoefler Decl. ¶¶ 58–61; Email from Robert Gilligan to IDHR, ECF No. 1-15. The exemption extends to any religious corporation's employment conduct for individuals "of" their particular religion who are engaged in "carrying on" their religious activities. 775 ILL. COMP. STAT. ANN. § 5/2-101(B)(2); *see id.* § 5/2-101(F) (defining "religion" to broadly include "all aspects of religious

[2] Defendants cite inapposite cases to assert that the Act is generally applicable and neutral. In *Illinois Bible Colleges Association v. Anderson*, 870 F.3d 631, 640 (7th Cir. 2017), as amended (Oct. 5, 2017), the challenged statutes did not contain exemptions but simply allowed a state board to consider individual factors in approving post-secondary institutions. But here, the Act contains categorical and individualized exemptions that "undermine[] the government's asserted interests," *Fulton*, 593 U.S. at 534, including in appropriately titled "exemption" sections, 775 ILL. COMP. STAT. ANN. § 5/2-104, *id.* § 5/3-106, *id.* § 5/4-104; *id.* § 5/5-102.1(b). Similarly, in *CompassCare*, 125 F.4th at 68, the plaintiff did not assert that the statute at issue lacked general applicability due to exemptions. *See* 2023 WL 5144365, at *7 (merely noting that the statute does not apply to employers without an employee handbook and not citing a system of categorical or individualized exemptions). And in *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000), the plaintiff did not "contest the government's characterization of the federal employment tax laws as neutral laws of general application." What's more, the statutes at issue in *Illinois Bible Colleges Association* placed "burdens on post-secondary institutions [that] d[id] not differ based on the religious nature of the institution[;] there [wa]s no basis to conclude that a religious institution would face any peculiar or significant impact." 870 F.3d at 640. But here, religious employers like Plaintiffs face peculiar and significant hardship from the Act's requirements.

observance and practice, as well as belief"). Plaintiffs are religious corporations that believe avoiding objectionable reproductive decisions is necessary to be "of" their religion and for "carrying on" their activities. VC ¶¶ 177–80. Defendants should have credited these beliefs, but they showed suspicion and hostility toward those beliefs, which caused them to reject Plaintiffs' request for accommodation under the statutory exemption. That lacks neutrality.

Defendants argue that Plaintiffs have "no First Amendment right to an exemption from a neutral and generally applicable regulation" and that Plaintiffs seek "preferential treatment under a neutral law." Defs.' Br. 28–29. This misunderstands Plaintiffs' argument. Plaintiffs are entitled to a *state statutory* exemption, and Defendants' suspicion of Plaintiffs' beliefs—namely, that avoiding objectionable reproductive decisions are necessary to be "of" their religion and "carrying on" its activities—caused Defendants to withhold the statutory exemption, giving rise to constitutional claims for lack of neutrality. Plaintiffs do not seek preferential treatment; they simply ask the State to treat them the same as other religious employers entitled to the Act's statutory religious exemption.

Defendants also argue that the Act's religious exemption does not show hostility because it "*favors* [religious employers] by excluding religious employers from regulation under certain circumstances." Defs.' Br. 29 (emphasis in original). That misses the point. Plaintiffs do not claim that the religious exemption alone lacks neutrality; Plaintiffs allege that Defendants do not treat Plaintiffs' religious exercise neutrally because they questioned whether Plaintiffs satisfy the belief predicates for the Act's religious exemption. Defendants have no good answer for refusing to exempt Plaintiffs' religious exercise, even though the Act has a

religious exemption and many other exemptions that undermine the government's asserted interests.

*Second*, Defendants showed more than a "subtle departure" from neutrality, *Masterpiece Cakeshop*, 584 U.S. at 638, when they publicly expressed their disdain for Plaintiffs' pro-life beliefs (decrying the demise of *Roe v. Wade*) and their preference for certain reproductive decisions that Plaintiffs oppose (committing to make Illinois an "oasis" and "safe haven" for "abortion"). Office of the Governor, *Gov. Pritzker Signs Landmark Legislation Further Expanding Reproductive Rights in Illinois*, https://perma.cc/K868-PRC2. Defendants assert that the "legislative history that Plaintiffs append reveals that the purpose of the law was to prevent discrimination based on reproductive health decisions, not to target religion." Defs.' Br. 29. But Defendants fail to acknowledge the evidence that their enforcement of the Act is motivated by their preference for reproductive decisions that violate Plaintiffs' beliefs. Office of the Governor, *Gov. Pritzker Signs Landmark Legislation Further Expanding Reproductive Rights in Illinois*, https://perma.cc/K868-PRC2.

### C. The Act violates the Church Autonomy Doctrine and its Ministerial Exception.

Plaintiffs state a claim and are likely to succeed in showing that the Act violates the church autonomy doctrine in three ways.

*First*, the Act's Employment Clause violates the ministerial exception. That exception protects Plaintiffs' right to "select, supervise, and if necessary, remove" ministerial employees "without interference by secular authorities." *Our Lady*, 591 U.S. at 747. So it protects Plaintiffs' right to follow faith-based employment policies that require them to discipline or refuse to hire ministerial employees based on reproductive decisions. But contrary to that protection, the Employment Clause

prohibits Plaintiffs from using reproductive decisions as a basis to "refuse to hire" or to take any other "act" in "recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, [or] tenure." 775 ILL. COMP. STAT. ANN. § 5/2-102(A).

Defendants say that Plaintiffs should not receive an injunction because "assessing whether a given employee qualifies as 'ministerial' requires a fact-intensive inquiry." Defs.' Br. 32. But Plaintiffs provided evidence to plausibly allege and likely show that certain of their employees are ministerial because they have "job duties reflect[ing] a role in conveying [Plaintiffs'] message and carrying out [their] mission." *Our Lady*, 591 U.S. at 750. At a minimum, the Diocese of Springfield has likely shown that its Respect Life Advocate is a minister because it *is the principal pro-life advocate for the Catholic Church*, conveying the Diocese's message as a practicing Catholic and carrying out the Diocese's mission by leading the Office for Pro-Life Activities and playing a crucial role in fostering education on reproductive issues consistent with Church teaching. VC ¶¶ 93–98; Respect Life Advocate Position Description, ECF No. 1-8 at 1–2. And PCC of Rockford has plausibly alleged and likely shown that its Staff Nurse is a minister because it conveys the PCC's message as a committed Christ-follower and carries out the PCC's mission by providing pro-life counseling to women and serving public relations roles at fundraisers and facility tours. VC ¶¶ 58–62; Staff Nurse Position Description, ECF No. 1-5 at 1–2.

Defendants do not dispute that Plaintiffs have likely shown that they have many other ministerial employees with "role[s] in conveying [Plaintiffs'] message[s] and carrying out [their] mission[s]." *Our Lady*, 591 U.S. at 750. PCC of Rockford relies on its employees to advance its Christian mission and message. VC ¶¶ 39–52;

Tibbetts Decl. ¶¶ 18–21. So its employees "represent The PCC—and more importantly, the Gospel of Jesus Christ—in their work as well as in their private lives." VC ¶ 51; PCC of Rockford Conduct Policy, ECF No. 1-4 at 1. And the Diocese's employees "represent the Catholic Church" and have a calling to advance its religious mission. VC ¶¶ 82–84; Diocese of Springfield Standards of Conduct, ECF No. 1-7 at 1.

Defendants also say that Plaintiffs should not receive "a blanket exemption" from the Act because they have non-ministerial employees. Defs.' Br. 32–33. But Plaintiffs do not seek a blanket exemption for all of their employees under the ministerial exception alone; they argue that the ministerial exception entitles them to injunctive relief for the ministerial positions they have identified, while the broader church autonomy doctrine supports injunctive relief allowing Plaintiffs to apply their conduct policies to non-ministerial employees. Even one ministerial position would require an injunction because the Act forbids Plaintiffs from considering certain reproductive decisions in their employment actions for *any* position. At this stage, it is enough that Plaintiffs have plausibly alleged and are likely to show that they each have at least one ministerial employee.

*Second*, the Employment, Accommodation, and Benefit Clauses violate the broader church autonomy doctrine because they violate the coreligionist exception by forcing Plaintiffs to hire employees who contradict their faith for any position, and they force Plaintiffs to accommodate and provide benefits related to reproductive decisions that violate their faith. 775 ILL. COMP. STAT. ANN. § 5/2-102(A); *id.* § 5/2-102(J)(1); *id.* § 5/2-102(A). Defendants argue that the church autonomy doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." Defs. Br. 33. But Plaintiffs do not *claim* immunity

from the entire Act. What they claim is the right to make employment decisions rooted in their faith, free from State interference. The church autonomy doctrine protects such decisions. *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655–68 (10th Cir. 2002).

Defendants also claim that the church autonomy doctrine does not expand beyond ministerial employees, asserting that a coreligionist exception "would swallow the ministerial exception." *Id.* at 33–34. Not so. The First Amendment broadly protects the right of religious organizations "to decide matters of faith and doctrine" and assures "independence" in "matters of church government." *Our Lady*, 591 U.S. at 746 (cleaned up). The ministerial exception is just one "component" of this "broad" church autonomy principle, *Id.* at 747, which "is not so narrowly confined" to the ministerial exception, *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari). Another component of church autonomy protects a religious organization's ability to require that *all* of its employees meet "the standard of morals required of them." *Serbian Eastern Orthodox Diocese for United States of Am. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976). Sometimes called the "coreligionist exemption," this protection prohibits penalizing employment decisions that are "based on religious doctrine." *Bryce*, 289 F.3d at 660.

Like the ministerial exception, the coreligionist exception flows from the Religion Clauses. Those clauses bar courts from adjudicating religious questions. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871). And deciding whether a religious organization's decision that was based on its religious beliefs violated nondiscrimination laws would necessarily require deciding what the organization's religion proscribes or prescribes, and whether the organization truly followed its

religious belief or practice. Endeavoring to answer such questions unconstitutionally entangles government in religion.

Also, the ministerial and coreligionist exceptions have different scopes. The ministerial exception protects all hiring decisions related to a *position* that a court considers ministerial. The coreligionist exemption, on the other hand, protects only a religious employer's hiring decisions for a *religious reason*: "If the religious employer fired the employee for a religious reason, then the 'religious questions' doctrine is implicated, and courts should avoid excessively entangling themselves by adjudicating the dispute." Athanasius G. Sirilla, *The "Nonministerial" Exception*, 99 Notre Dame L. Rev. 393, 417 (2023). So the coreligionist exception protects Plaintiffs' *religious* employment decisions for their non-ministerial employees and the ministerial exception would protect all their employment decisions for their ministerial employees.

Finally, as Defendants do not even attempt to dispute, the Act's Offensive Speech Clause violates the church autonomy doctrine by prohibiting Plaintiffs' workplace speech on important matters of faith and doctrine, Pls.' Memo 25–26, and thus "interfer[ing] with a religious organization's internal governance," *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 981 (7th Cir. 2021).

### D. The Act violates Plaintiffs' right to free speech.

Defendants' brief provided no basis for dismissal or denying injunctive relief.

*First*, Defendants do not meaningfully engage Plaintiffs' argument that the Act restricts speech based on content; they merely state that the law is content-neutral and cite *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), to support their position. That's wrong, and *R.A.V.* undermines rather than helps their argument. A regulation is content-based if it applies to speech "because of the topic discussed or

the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Offensive Speech Clause only restricts speech that is "unwelcome," "offensive," and only on the topic of reproductive decisions. 775 ILL. COMP. STAT. ANN. 5/2-101(E-1); 5/2-102(A). The Employment Clause restricts speech on the topic of reproductive decisions while allowing speech on other topics. *Id.* § 5/2-102(A). This is textbook content discrimination. *See Reed*, 576 U.S. at 164 (law is content-based if officials "must examine the content of the message that is conveyed" to determine its applicability).

Defendants incorrectly rely on *R.A.V.* to argue that all restrictions on "harassment" are categorically content-neutral. *R.A.V.* held that even within a proscribable category like fighting words, the government may not selectively prohibit speech based on its subject matter or viewpoint. 505 U.S. at 384–86. Here, the Act does not target all workplace harassment; it selectively targets "unwelcome" speech about reproductive health decisions—a specific subject matter tied to moral and religious debate. Moreover, *R.A.V.* makes clear that laws are unconstitutional when they allow officials to impose sanctions on "disfavored subjects or viewpoints." *Id*. at 391. That is what this Act does: it sanctions religious speech that disapproves of certain reproductive decisions while leaving other views untouched.

*Second*, Defendants say that the Act is viewpoint-neutral because it does not *facially* single out pro-life religious views for disfavored treatment. Defs.' Br. 26. But Defendants fail to respond to Plaintiffs' argument that the Act purports to cover all speakers but only "bites" speakers who take a critical stand on contraception, abortion, and technologies like IVF. *See* Pls.' Memo 20–21. The Act restricts speech based on viewpoint because it allows supportive and permissive viewpoints on the

subject but only penalizes pro-life speech in practice. *See Brown*, 86 F.4th at 780–83.

*Third*, Defendants try to downplay the speech restrictions caused by harassment statutes like the Offensive Speech Clause, confirming that such laws target speech that the State considers "harmful or offensive." Defs. Br. 24. Defendants notably ignore the Seventh Circuit's decision in *Demkovich*, which held that harassment and hostile work environment laws interfere with religious autonomy and speech. 3 F.4th at 981. Religious organizations communicate their "faith and mission through [their] work environment," and in this context where speech is "stern counsel to some" but "bigotry to others," courts cannot distinguish "discipline from discrimination" or "advice from animus" without violating the First Amendment. *Id.*

Defendants say that Plaintiffs failed to allege that they risk liability for harassment by engaging in severe or pervasive speech, Defs.' Br. 24, but the Verified Complaint does precisely that. Plaintiffs allege that they engage in "pervasive and severe speech and conduct" to express their message. VC ¶¶ 143, 148. Their expression is pervasive because it occurs daily and in many contexts. *Id.* ¶¶ 144, 149. It is severe because it communicates a message that a person's decision to obtain or facilitate an abortion is immoral, sinful, unjustified, and is comparable to committing murder by hiring hitmen and contract killers—terms and comparisons that are generally considered unwelcome, offensive, hostile, or derogatory. *Id.* ¶¶ 145, 150. Plaintiffs even alleged that their open positions receive and engage in pervasive and severe expression. *Id.* ¶¶ 146–47, 151–55.

*Fourth*, Defendants argue that hiring, firing, providing benefits, and affording accommodations are not expressive acts protected by the Free Speech

Clause. Defs.' Br. 22. This mischaracterizes Plaintiffs' claims and ignores the inherently expressive nature of their employment practices. Separate from the acts of hiring and firing, Plaintiffs allege that the Act forbids the publication of written statements and recruiting procedures (including applications and interview questions), which are at the heart of speech. *See* VC ¶¶ 134, 139–40. And Plaintiffs' written policies and employee handbooks are inherently expressive because they "comprehensively communicate [their] its own message without additional speech." *The Bail Project, Inc. v. Ind. Dep't of Ins.*, 76 F.4th 569, 575 (7th Cir. 2023) (quoting *Tagami v. City of Chi.*, 875 F.3d 375, 378 (7th Cir. 2017). For example, contrary to Defendants' assertion, the PCC of Rockford's conduct policy comprehensively states the ministry's beliefs and *directly* connects them to its expressive pro-life mission: "[T]o maintain the core values of our faith-based organization and operate as the hands and feet of Jesus Christ, The Pregnancy Care Center and all employees and volunteers must never violate the sixth commandment or Genesis 9:6 by referring, assisting in the procurement of, providing, or receiving an abortion." PCC of Rockford Employee Handbook, ECF No. 1-3 at 6.

Defendants' reliance on *Bail Project*, 76 F.4th at 577, is misplaced. There, the court found no inherent message in paying bail without additional speech explaining the organization's mission. Here, Plaintiffs' employment policies naturally and inherently communicate their pro-life religious beliefs. A reasonable observer would "detect [this] message" without needing to investigate the websites of pro-life pregnancy centers and Catholic dioceses. That satisfies the *Tagami* standard. 875 F.3d at 378.

*Fifth* and finally, Defendants contend that the Notice Clause does not compel speech because it does not expressly mention reproductive decisions and because it

is commercial speech under *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985). This argument fails because the Notice Clause requires employers to post a State-prepared or -approved notice "summarizing the requirements of this Article," 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1), and that notice says that employers "may not treat people differently based on . . . any [] protected class named in the Act." ILL. DEP'T OF HUM. RTS., *Employer Notice*, https://perma.cc/PK9A-SVUB. Because the New Bill added reproductive decisions as a protected characteristic, the Notice Clause *does* impact Plaintiffs' speech on reproductive decisions.

And Defendants have no answer to Plaintiffs' argument distinguishing *Zauderer*, which only applies when the State compels purely factual and uncontroversial information. *See* 471 U.S. at 651. Plaintiffs made clear that they do not object to making purely factual and uncontroversial statements that the State enacted the New Bill. Pls.' Memo 22. But the State-approved notice requires more, forcing Plaintiffs to make a different statement directly addressed and tailored to their particular employees, saying to each that "*you* have the right to be free from" what the State calls "unlawful discrimination" and "harassment" related to reproductive decisions. ILL. DEP'T OF HUM. RTS., Employer Notice, https://perma.cc/PK9A-SVUB (emphasis added). *That* statement goes beyond conveying purely factual and uncontroversial information and applies the Act's requirements to *Plaintiffs*' particular employees, including ministers. The Notice Clause does not meet *Zauderer*'s narrow exception for compelled commercial speech.

### E. Plaintiffs' Equal Protection claim survives dismissal.

Plaintiffs did not seek a preliminary injunction on their Equal Protection claim, and the claim survives dismissal because they alleged the required elements. Defendants argue that Plaintiffs' Equal Protection claim fails because the Act is

facially neutral with no discriminatory purpose. Defs.' Br. 30–31. But they misstate both the standard at this stage and the allegations in the Verified Complaint.

To survive a motion to dismiss, Plaintiffs need only plead facts that, if true, make it plausible that the law was adopted or applied with discriminatory intent and that it resulted in unequal treatment. *See Ashcroft*, 556 U.S.at 678; *Smith v. City of Chicago*, 3 F.4th 332, 335 (7th Cir. 2021). The Supreme Court presumes discriminatory intent when a law's classifications disadvantage a suspect class or hinder the exercise of a "fundamental right. *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982). A plausible Equal Protection claim doesn't require direct evidence of animus. It is sufficient to allege (1) that Plaintiffs are similarly situated to others who are treated more favorably, (2) that the law imposes a burden on them based on a protected classification (such as religion), and (3) that the disparate treatment was at least partly motivated by discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

Here, Plaintiffs allege that they are similarly situated to employers who are treated more favorably because their employment relationships are exempt from the Act. VC ¶ 275–77. Plaintiffs allege that the Act burdens their exercise of religion by chilling faith-based speech and interfering with religious hiring requirements. VC ¶¶ 209, 280–81. And Plaintiffs allege that the different treatment was at least partly motivated by a desire to target pro-life religious groups. VC ¶¶ 278–81. Indeed, Plaintiffs explained that the so-called neutral requirements of the New Bill only "bite" those who *oppose* certain reproductive decisions—overwhelmingly, pro-life religious ministries. *See* Pls.' Memo 20. The Act's design, its targeting of reproductive health decisions for special protection, and official statements celebrating the law as a *response* to religious pro-life beliefs all support a plausible

inference of intent to burden religious actors for their beliefs. *See Lukumi*, 508 U.S. at 534 (facial neutrality insufficient when design and operation reflect religious targeting).

Thus, Plaintiffs have stated a valid Equal Protection claim that cannot be dismissed at the pleading stage.

## III. Plaintiffs satisfy the other preliminary injunction factors.

Plaintiffs' likelihood of success on even one of their claims is "determinative," *Korte*, 735 F.3d at 666, but Plaintiffs satisfy the other factors as well.

***Likelihood of Irreparable Harm.*** "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because Plaintiffs are likely to succeed on the merits of their First Amendment claims, they are likely to suffer irreparable harm. Defendants cannot dispute that the Act chills Plaintiffs from publishing statements that they want to include on job websites and position descriptions. The Act also interferes with Plaintiffs' recruitment and hiring, causing them to favor internal applicants to avoid applying their policies to more people and causing them to refrain from engaging staffing agencies to fill open positions. Supp. Tibbetts Decl. ¶¶ 17, 19–21. Every day, Plaintiffs continue to receive applications and schedule interviews that obtain and use information about applicants' reproductive decisions. All of these are enough to show irreparable harm.

***Equities and Public Interest.*** The equities and public interest also strongly favor an injunction. Defendants simply parrot their generalized interest in stopping discrimination in employment, Defs.' Br. 39–40, but they do not respond to Plaintiffs argument about the parties' comparative interests in relief. If Plaintiffs obtain relief to operate according to their beliefs, "the right to be free of

discrimination for having an abortion will be impaired only to the limited extent that a person cannot join" Plaintiffs' staff in particular. *Slattery*, 61 F.4th at 289. "But if the state could require an association that expressly opposes abortion to accept members who engage in the conduct the organization opposes, it would severely burden the organization's" constitutional rights. *Id.* at 289–90. Thus, the equities and public interest favor an injunction. *Id.* at 290.

## CONCLUSION

For these reasons, the Court should deny Defendants' motion to dismiss and grant Plaintiffs' motion to issue the requested preliminary injunction.

Respectfully submitted this 20th day of June, 2025,

s/ Mark Lippelmann

Mark Lippelmann, AZ Bar No. 036553*
mlippelmann@ADFLegal.org
Ryan Tucker, AZ Bar No. 034382*
rtucker@ADFLegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

David Cortman, N.D. Ill. Bar No. 188810
dcortman@ADFLegal.org
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE,
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

Whitman H. Brisky, IL Bar No. 1665634
wbrisky@mauckbaker.com
MAUCK & BAKER, LLC
1 North LaSalle Street, Ste. 3150,
Chicago, IL 60602
(312) 726-1243

*Attorneys for Plaintiffs*
**Pro Hac Vice Application Pending*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

s/ Mark Lippelmann
Mark Lippelmann